| DISTRICT COURT, DENVER COUNTY, COLORADO<br>Court Address: 1437 Bannock St., Denver CO 80202<br>720-865-8301 | |
|---|---|
| **Plaintiffs:**<br><br>Otimo Music, Inc., a Corporation,<br><br>**v.**<br><br>**Defendants:**<br><br>Royalty Exchange, Inc., a Delaware Corporation<br>MIH Entertainment, LLC<br>Michael W. Conner, Jr. | DATE FILED: November 24, 2017 1:40 PM<br>FILING ID: A139A014451B6<br>CASE NUMBER: 2017CV34357<br><br><br><br>**<u>COURT USE ONLY</u>** |
| Attorneys for Plaintiff:<br>Thomas P. Howard, #31684<br>William C. Groh, III, #43577<br>THOMAS P. HOWARD, LLC<br>842 South Boulder Road, Suite 100<br>Louisville, Colorado  80027<br>Telephone: (303) 665-9845<br>Facsimile: (303)  665-9847<br>E-mail: thoward@thowardlaw.com<br>        wcgroh@thowardlaw.com | Case Number:<br><br>Courtroom/Division ____ |
| **COMPLAINT** | |

COMES NOW Thomas P. Howard, LLC on behalf of the Plaintiff, Otimo Music, Inc. and files this complaint against Royalty Exchange, Inc., MIH Entertainment, LLC, and Michael W. Conner, Jr., and states as follows:

## I.    Introduction

1.      The present lawsuit involves the purchase of purported rights to a music catalog via an internet auction.  The auction house misrepresented its level of due diligence to verify the legitimacy of the "rights" purportedly being sold, causing the buyer to pay $420,000 for "rights" that do not exist and/or are commercially useless.

2.      The music catalog at issue in this case involves musical master recordings, music videos and musical compositions from a catalog of certain musical compositions, master recordings, and music videos created and/or performed by Alex Gonzalez Velasquez p/k/a King Lil G ("King Lil G").  This catalog is hereafter referred to as the "Catalog."  The defendant, MIH

Entertainment, LLC ("MIH"), falsely claimed to have certain unencumbered rights in the Catalog and sold them pursuant to an internet auction operated by defendant Royalty Exchange, Inc. ("RX").

## II.     Parties, Jurisdiction and Venue

3.     Otimo Music, Inc. ("Otimo") is a corporation located in Montreal,, Quebec Canada.  Otimo is a successor in interest to all of the claims of Ryan Stotland ("Stotland") regarding the transaction herein, including all rights and any accrued causes of action.

4.     RX is a Delaware corporation located in Denver County.

5.     MIH is a California Limited Liability Company located in Los Angeles County.

6.     Michael W. Conner, Jr. ("Conner") is a resident of California.

7.     Upon information and belief, Conner, owns and operates MIH.  At all times material to the allegations in this Complaint, Conner has acted on behalf of MIH.

## III.    Facts Common to all Claims for Relief

### A. The Business of RX

8.     RX operates an online market for buying and selling royalty assets and rights, in economic sectors including but not limited to, music, book publishing, television, film, pharmaceutical, and energy.

9.     To sell royalty rights through RX, a seller must contact RX and arrange for RX to place the royalty rights at auction.

10.     A prospective buyer can "sign up" for RX, whereby the buyer will receive information regarding specific buying opportunities.

11.     RX's website contains a "FAQ" section by which RX addresses how a buyer can verify "the legitimacy and legality of a transaction".  In this FAQ section, RX expressly states the following:

> "Royalty Exchange verifies the ownership of each asset with both the current owner and the organization responsible for collecting and dispersing the royalties it generates before it is listed on our site."

12.     Through the above statement, RX states on its public website that it verifies ownership of the assets by, in part, checking with the organizations responsible for collecting and dispersing the royalties generated in connection with each asset (hereafter "Royalty Payers").

13.     RX has additionally described its process of verification of ownership of the assets as including the development of a "real relationship with the artists involved."  In an interview given by Anthony Bruno of RX in response to the question "How do you weed out potential sales that are from predatory arrangements where a manager, business manager or somebody else, is taking advantage of an artist?", Mr. Bruno stated as follows:

We only work with the person holding the rights directly. Any number of people might own a portion of the royalties to a song. So long as we can prove they own it, we can help them sell it.

Every deal involves multiple conversations via both phone and email with the seller. Through that process, we develop a real relationship with the artists involved. In fact, over half of them either come back for a second deal, or they refer a friend.

We've not encountered a situation that we know of where we felt someone was being manipulated into working with us. If anything, working with us has helped artists get out of predatory advances and loans with others.

14.     A buyer who desires to sign up for RX must indicate acceptance of the "terms of use," a series of terms attached to the RX website and attached hereto as Exhibit 1 ("RX Terms of Use").

15.     The RX Terms of Use are presented on a "take it or leave it" basis and are not subject to negotiation.

16.     The RX Terms of Use further provide, with respect to those who place a bid, the following: by making a bid in an auction, you agree you are entering a legally binding contract with the seller to purchase the right or item for the amount of your bid.

17.     Stotland initially signed up on the RX website in 2015, but did not act on any purchase opportunities until after having initial communications with Jeff Schneider of RX in July and August of 2016 concerning the nature of RX's business operation.

18.     The conversations between Stotland and Schneider involved questions about auctions with assets that may be directly connected to Canadian Public Performing Rights Organizations and a general exchange of information.  Stotland and Schneider discussed some investments and deals Stotland had made in the past individually and with his family.

19.     Afterward, Stotland placed a few bids on certain catalogs but did not win any of them.

**B.  The King Lil G Catalog and Listing with RX**

20.     MIH purported to own the rights to the Catalog pursuant to an "Artist and Record Company Multiple Rights Agreement" dated January 7, 2013 ("Recording Agreement").

21.     On March 3, 2017, MIH entered into a listing agreement with Royalty Exchange ("Listing Agreement") for the sale of the MIH's purported rights in the Catalog pursuant to the Recording Agreement ("MIH Purported Rights").

22.     MIH and RX updated the Listing Agreement on June 28, 2017.  A copy of the updated Listing Agreement is attached as Exhibit 2.

3

23.     Pursuant to the Listing Agreement, MIH would list the MIH Purported Rights at a starting price of $350,000, and RX would receive a 15% commission pursuant to the sale of the MIH Purported Rights.

### C.  The Undisclosed California Action

24.     At the same time that MIH and RX were preparing to list the MIH Purported Rights for Auction, King Lil G was entering into claims against MIH and Conner for misappropriation of royalty revenue, sabotaging King Lil G's rights in the Catalog, failure to respond to requests for accounting, and for fraudulently misrepresenting their authority to act on behalf of King Lil G.

25.     On March 7, 2017, four days after the signing of the listing agreement between MIH and RX, King Lil G filed suit against Conner and MIH in Superior Court of the State of California, Case Number BC-653688 ("California Action").  The complaint is attached and incorporated herein by reference as Exhibit 3.

26.     The complaint in the California Action included allegations 1) that King Lil G owned "the intellectual property and the rights reserved as creator and owner of King Lil G including, but not limited to (i) King Lil G's business and assets; (ii) the rights to the King Lil G name, trademarks and copyrights associated with King Lil G; and (iii) the right to license and exploit the King Lil G name.  (See Exhibit 3, California Complaint at ¶ 3.)

27.     The complaint also alleged Conner and MIH "devised and implemented a scheme to sabotage [King Lil G]'s control and rights of the KLG brand without knowledge or consent from [King Lil G] and misappropriated revenue beyond the contractual agreement, for the Defendants' own benefit."  (See Exhibit 3, California Complaint at ¶ 5.)

28.     The complaint further alleged Conner and MIH had wrongfully failed to respond to King Lil G's repeated requests for an accurate accounting of applicable royalty revenue.  (See Exhibit 3, California Complaint at ¶ 6.)

29.     The complaint also alleged Conner and MIH "have actively and fraudulently misrepresented their contractual permission to third parties sabotaging [King Lil G]'s ability to promote and exploit his KLG brand."  (See Exhibit 3, California Complaint at ¶ 7.)

30.     Upon information and belief, Conner and MIH were on actual notice of the dispute giving rise to the California Action at the time MIH initially contacted RX with the purpose of selling the MIH Purported Rights.  Upon information and belief, on February 17, 2017, MIH and Conner had received a cease and desist letter from King Lil G demanding an accounting from MIH and Conner and demanding that MIH and Conner cease and desist from representing MIH and Conner were acting as King Lil G's manager or were in any way affiliated with King Lil G.

### D.  The Auction of the MIH Purported Rights and Sale to Stotland

31.     Despite the existence of the California action, RX and MIH moved forward with the listing agreement and prepared to auction the MIH Purported Rights.

32.     On July 19, 2017, Stotland received an email regarding Q & A on the MIH Purported Rights. Stotland emailed Schneider the following day to discuss bidding on the same. Schneider directed Stotland to speak with Rob Bernhard ("Bernhard"), telling Stotland that Bernhard was on RX legal team and "he has run point on the diligence and knows more about the asset."

33.     Stotland and Bernhard initially discussed the MIH Purported Rights over the phone on July 20, 2017. Bernhard explained RX had conducted due diligence regarding the MIH Purported Rights.

34.     As a result of Bernhard's statements, Stotland felt comfortable RX had conducted appropriate due diligence as to the MIH Purported Rights.

35.     That same day, Bernhard sent Stotland a sample purchase agreement which Stotland could anticipate signing in connection with a successful bid on the MIH Purported Rights and a google drive link to a zip file called "Redacted agreements.zip," which contained documents connected to MIH's Purported Rights.

36.     Prior to the bidding on MIH Purported Rights, Howard Stotland, Stotland's father, expressed concerns about due diligence, indicating he would not help finance the deal unless he was satisfied as to due diligence, and wanted to speak to an executive of RX regarding RX's due diligence.

37.     As a result, on July 21, 2017 and prior to bidding on the MIH Purported Rights, Stotland conducted a telephone call with himself, Schneider, and Howard Stotland. During this approximately half hour call, the parties discussed the due diligence RX claimed to have conducted in connection with the MIH Purported Rights.

38.     During the July 21, 2017 call Schneider told the Stotlands that RX had performed a thorough due diligence with regards to the MIH Purported Rights which included checking for lawsuits, liens and other possible impediments to the transfer of rights. Schneider said RX had conducted the due diligence process with regards to the MIH Purported Rights over a four month period starting in March 2017.

39.     In reasonable reliance on RX's representations of comprehensive due diligence made on July 21, 2017, as well as RX's prior representations to Stotland and the representations contained in RX's advertising on its website, Stotland decided to bid on the MIH Purported Rights. On July 21, 2017, that same day, Stotland then won the MIH Purported Rights at Auction, submitting the winning bid of $420,000.

40.     After winning the auction for the MIH Purported Rights, Stotland received a call from Bernhard at RX, who asked Stotland to sign the purchase agreement, wire RX $ 420,00.00, and conduct his own due diligence, all within three business days. Stotland asked for additional time to incorporate Otimo to be the vehicle for the investment and to set up a bank account for Otimo.

41.     Otimo and MIH signed the purchase agreement for the MIH Purported Rights on July 31, 2017.  A copy of the purchase agreement is attached and incorporated herein by reference as Exhibit 4.

42.     MIH made the following representations pursuant to the Purchase Agreement.

    a.  That MIH "is the sole owner of its interest in the [MIH Purported Rights] and is the sole owner of the musical compositions, sound recordings and master videos[,] copyrights which are being assigned under this Agreement.  The [MIH Purported Rights] are free and clear from all encumbrances and none of the musical compositions, sound recordings and master videos being assigned to [Otimo] under this Agreement does not infringe the rights of any third party.  [MIH] has has [sic] full authority to enter into this agreement to perform its obligations, and no person holds a power of attorney on [MIH's] behalf affecting the assigned interest."  (Exhibit 4 at ¶ 3.1)

    b.  That MIH "has not and shall not do anything that would impair [Otimo's] right to receive the [MIH Purported Rights]."  (Exhibit 4 at ¶ 3.2.)

    c.  That "[n]o valid adverse claim exists with respect to the [MIH Purported Rights] or any other rights assigned by [MIH].  [MIH] is not bound by any action or agreement that would prevent it from performing its obligations and no current or prior employee of [MIH] has any actual or potential claim against [MIH] or the [MIH Purported Rights] that would in any way impair the rights being assigned to [Otimo]."  (Exhibit 4 at ¶ 3.3.)

    d.  That "[a]ll material obligations to the assignment have been satisfied including, without limitation, the obtaining of any approval, the giving of any notice, the making of any filing, and the satisfying of any payments or claims of any third party.  No third party has a right of first refusal with respect to the Assigned Rights."

43.     In reasonable reliance on the representations received from MIH and RX, Otimo sent RX the $420,000 purchase price on August 1, 2017.

44.     RX sent Stotland the assignment of rights contract on August 2, 2017.

45.     Between August 2, 2017 and August 24, 2017, the parties worked with the relevant Royalty Payers, including Select-O-Hits, Live Nation, SoundExchange, and Sovereign Music to arrange for payment of royalties to be made after August 1st, 2017 to Stotland.

46.     On August 24, 2017, counsel for Stotland was notified of the existence of the California Action by Nicholas Jampol, Live Nation's counsel.  Mr. Jampol indicated he had been advised of this California Action by the attorney for King Lil G and thereafter, Mr. Jampol accessed copies of the complaint in the California Action from the public records, where they were available.

47.     Upon learning of the California Action, Stotland's counsel called Bernhard and emailed him the complaint in the California Action, notifying him of the issue.

48.     Also on August 24, 2017, Bernhard emailed Connor of MIH regarding the lawsuit, saying "Hi Michael, just got a call and email from Ryan's attorney regarding a lawsuit by KLG.  Please give me a call to discuss."

49.     Upon learning of the California Action, Otimo quickly undertook investigation of the issues being litigated in the California Action.  Otimo learned that King Lil G was contending MIH never owned any rights in the catalog.  Counsel for King Lil G provided Otimo with a handwriting expert report which concluded the signature on the Recording Agreement was a forgery, and consequently, that MIH never owned any rights in the Catalog.  Counsel for MIH provided a handwriting expert report which contended the signature on the Recording Agreement was authentic, and as such, MIH did own rights in the Catalog.

50.     Upon information and belief, MIH never paid King Lil G any money or provided any royalty statements pursuant to the Recording Agreement.  Counsel for King Lil G has informed Otimo that King Lil G would seek to collect these unpaid royalties against Otimo if Otimo were to step into MIH's shoes as an assignee even if the Recording Agreement were not void.

51.     On September 5, 2017, counsel for Otimo sent a rescission demand to RX via email, followed up by a demand for the same by letter on September 6, 2017.  RX failed and refused to honor this demand.

52.     On September 7, 2017, King Lil G filed an amended complaint in the California action ("Amended California Complaint").  The Amended California Complaint contained additional assertions including, among other things, that the Recording Agreement was a forgery, and that MIH did not own the rights to the Catalog, and had fraudulently collected hundreds of thousands of dollars belonging to King Lil G.  (See Exhibit 5, Amended California Complaint at ¶ 48-62.)

53.     On November 10, 2017, counsel for Otimo sent a rescission demand to MIH Entertainment.  MIH has refused to honor this demand.

54.     The Amended California Complaint further alleged MIH and Conner never provided King Lil G with any royalty statements as required by the Recording Agreement.  (See Exhibit 5, Amended California Complaint at ¶ 53.)

55.     Also during the month of September, an additional controversy arose between Otimo and MIH regarding, as between Otimo and MIH, which royalty payments were to be attributed to MIH and which were to be paid to Otimo.

56.     Otimo has contacted all remaining relevant royalty payers, including Live Nation, Select-O-Hits, SoundExchange, and ASCAP and advised them to withhold all royalty payments pending resolution of the matter.

57.     Otimo not only has been unable to fully consummate the transaction described herein regarding Royalty Payers, but any such royalty payments received from the Royalty Payers would be subject to claims from King Lil G due to 1) King Lil G's claim that MIH never owned any rights in the Catalog; and 2) that MIH never paid King Lil G any money or provided royalty statements pursuant to the Recording Agreement.

### E. RX's Failure to Conduct Due Diligence

58.     Upon information and belief, RX never checked for lawsuits in connection with the Catalog despite representing to the Stotlands that RX had done so.  Bernard's August 24, 2017 email to Conner described in paragraph 48 reflects a clear lack of prior awareness of the California Action.

59.     RX never contacted King Lil G regarding the proposed sale of the MIH Purported Rights or the status of royalty payments due and owing under the Recording Agreement.  The initial California Action included no reference to the auction and was only amended after King Lil G had made contact with Live Nation regarding royalty payments associated with King Lil G's music videos.

60.     Upon information and belief, RX never contacted SoundExchange, one of the Catalog's Royalty Payers, to inquire about the ownership of each album in the Catalog. Had RX done so, RX would have discovered that some of the recordings from the Catalog album "Blue Devil Part 2", are registered at SoundExchange to the record company PR Records as opposed to MIH Entertainment.

61.     Upon information and belief, although RX did contact Select-O-Hits, one of the Catalog's Royalty Payers, RX failed to inquire about the ownership of each album in the Catalog and to review a royalty statement from Select-O-Hits.  Had RX inquired about this ownership or reviewed a royalty statement, it would have discovered that the record label listed for the Catalog albums "Blue Devil Part 2", King Enemy" and "Lost in Smoke" is Double 9 Records as opposed to MIH Entertainment.

62.     Upon information and belief, RX never confirmed that MIH had all of the essential pieces necessary for there to be a full transfer of the master recording rights in the Catalog as MIH was not able to transfer to Otimo all of the album artwork for the albums in the Catalog and the master audio stem files for the albums in the Catalog.

63.     Upon information and belief, RX did not appropriately investigate the reason why MIH never registered the music compositions in the Catalog in order to collect royalties with Sovereign Music, a company responsible for the administration of the payment of royalties for the exploitation of music compositions, including those from the American Society of Composers, Authors and Publishers (ASCAP).

64. Stotland and Otimo reasonably relied to their detriment on RX's misrepresentations that it had conducted due diligence and checked for lawsuits and other impediments to the transfer of the MIH Purported Rights.

65. Stotland and Otimo's reasonable reliance to their detriment on RX's misrepresentations resulted in their agreement to conduct an extremely short period of due diligence for a transaction of this nature, and carrying out abbreviated lines of inquiry as to the MIH Purported Rights.

66. RX's knowing failure to conduct due diligence with respect to MIH's purported rights, combined with RX's misrepresentations as to its due diligence described herein, was in willful and wanton breach of RX's obligations under the RX Terms of Use.

**First Claim for Relief – Breach of Contract (Royalty Exchange, Inc.)**

67. Otimo hereby realleges and incorporates paragraphs 1 through 66 as if fully stated herein.

68. The RX Terms of Use constituted a valid and binding contract between RX and Plaintiff.

69. RX expressly stated it had conducted due diligence with respect to the MIH Purported Rights in its advertising and personally to the Stotlands as described herein.

70. These express statements constituted representations and warranties pursuant to the RX Terms of Use.

71. RX's failure to conduct due diligence and false representations concerning the extent and character of its due diligence constitute a willful and wanton breach of RX's obligations under the RX Terms of Use.

72. As a result of RX's breach of the RX Terms of Use, Plaintiff has suffered reliance damages in the amount of the purchase price described herein, plus additional expenses incurred by Plaintiff in reliance on RX's performance under the RX Terms of Use, in an amount to be determined at trial.

**Second Claim for Relief – Rescission of Purchase
Agreement (MIH and Royalty Exchange)**

73. Otimo hereby realleges and incorporates paragraphs 1 through 72 as if fully stated herein.

74. MIH falsely represented that it had not done anything that would impair Otimo's rights in the MIH Purported Rights, in breach of MIH's obligations and statements of fact in paragraph 3.2 of the Purchase Agreement.

75. MIH falsely represented it was not bound by any action or agreement that would prevent it from performing its obligations, in breach of MIH's obligations and statements of fact in paragraph 3.3 of the Purchase Agreement.

76.     MIH falsely represented it had satisfied all material conditions to the assignment of the MIH Purported Rights, in breach of MIH's obligations and statements of facts in paragraph 3.4 of the Purchase Agreement.

77.     Otimo reasonably relied on MIH's false representations by agreeing to move forward with the Purchase Agreement as described herein.

78.     Due to MIH's false and material representations and material breaches of the Purchase Agreement as stated herein, Otimo is entitled to rescission of the Purchase Agreement and a refund of the purchase price.

79.     Otimo has requested rescission of the Purchase Agreement, and MIH and Royalty Exchange have refused to agree to or arrange for rescission.

80.     Otimo can tender all of the MIH Purported Rights and direct all applicable royalty vendors to redirect royalty payments to MIH. Otimo has not collected any such payments and can direct any and all payments that are or will be due and owing after the date of the Purchase Agreement to MIH.

### Third Claim for Relief – Rescission of Purchase Agreement
### (Alternative Claim)

81.     Otimo hereby realleges and incorporates paragraphs 1 through 80 as if fully stated herein.

82.     MIH falsely claimed to own the MIH Purported Rights, which were predicated on a Recording Agreement which, upon information and belief, was either 1) forged and therefore void *ab initio*; or 2) was voidable due to fraud and/or failure of consideration and has since been rescinded by King Lil G in connection with the California Lawsuit.

83.     Due to MIH's false and material representations as stated herein, Otimo is entitled to rescission of the Purchase Agreement and a refund of the purchase price.

84.     Otimo has requested rescission of the Purchase Agreement, and MIH and Royalty Exchange have refused to agree to or arrange for such a rescission.

85.     Otimo can tender all of the MIH Purported Rights and direct all applicable royalty vendors to redirect royalty payments to MIH.  Otimo has not collected any such payments and can direct any and all payments that are or will be due and owing after the date of the Purchase Agreement to MIH.

### Fourth Claim for Relief – Securities Fraud
### Colorado Securities Act- RX

86.     Otimo hereby realleges and incorporates paragraphs 1 through 85 as if fully stated herein.

87.     The MIH Purported rights constituted a security within the meaning of the Colorado Securities Act as defined under C.R.S. § 11-51-201.

88.     RX's conduct described herein with respect to the MIH Purported Rights was in connection with the offer, sale, and purchase of a security within the meaning of C.R.S. § 11-51-501.

89.     RX's advertising and statements to the Stotlands regarding the extent of RX's due diligence described herein, as well with RX's failure to reveal the severely deficient manner in which RX had supposedly conducted due diligence with respect to the MIH Purported Rights, constitute material misrepresentations and securities fraud within the meaning of C.R.S. § 11-51-501(1)(b) and (c).

90.     RX's advertising and statements to the Stotlands regarding the extent of RX's due diligence described herein, as well with RX's failure to reveal the severely deficient manner in which RX had supposedly conducted due diligence with respect to the MIH Purported Rights were knowing and reckless in violation of C.R.S. § 11-51-604(3).

91.     In the alternative, RX's statements to the Stotlands regarding the extent of RX's due diligence described herein, as well with RX's failure to reveal the severely deficient manner in which RX had supposedly conducted due diligence with respect to the MIH Purported Rights were in violation of C.R.S. § 11-51-604(4).

92.     Stotland and Otimo reasonably relied on the above statements and conduct as described herein, and have suffered damages as a result of said reliance.

93.     As a result of RX's violations of the Colorado Securities Act as stated herein, Otimo is entitled to Rescission of the Purchase Agreement and a return of consideration paid for the MIH Purported Rights.

94.     In the alternative, and in the event Rescission cannot be granted, Otimo is entitled to an award of damages in an amount to be determined at trial.

### Fifth Claim for Relief – Securities Fraud
### Colorado Securities Act (MIH and Conner)

95.     Otimo hereby realleges and incorporate paragraphs 1 through 94 as if fully stated herein.

96.     The MIH Purported rights constituted a security within the meaning of the Colorado Securities Act as defined under C.R.S. § 11-51-201.

97.     MIH and Conner's conduct described herein with respect to the MIH Purported Rights was in connection with the offer, sale, and purchase of a security within the meaning of C.R.S. § 11-51-501.

98. Upon information and belief, MIH and Conner deliberately failed to disclose King Lil G's claims to RX, Stotland, or Otimo prior to the sale of the MIH Purported Rights, as well as MIH's failure to pay to King Lil G amounts due and owing under the Recording Agreement.

99. MIH and Conner made further misrepresentations to Otimo in Paragraph 3 of the Purchase Agreement concerning the nature of the MIH Purported Rights as described herein.

100. These misrepresentations were knowing, reckless, and committed with an intent to defraud in violation of C.R.S. § 11-51-604(3).

101. In the alternative, these misrepresentations were made in violation of C.R.S. § 11-51-604(4).

102. Stotland and Otimo reasonably relied on these misrepresentations by agreeing to conduct an extremely short period of due diligence for a transaction of this nature, and carrying out abbreviated lines of inquiry as to the MIH Purported Rights.

103. As a result of MIH and Conner's violations of the Colorado Securities Act as stated herein, Otimo is entitled to Rescission of the Purchase Agreement and a return of consideration paid for the MIH Purported Rights.

104. In the alternative, and in the event Rescission cannot be granted, Otimo is entitled to an award of damages in an amount to be determined at trial.

### Sixth Claim for Relief – Common Law Fraud
### (MIH and Conner)

105. Otimo hereby realleges and incorporate paragraphs 1 through 104 as if fully stated herein.

106. MIH and Conner made material misrepresentations of fact to Stotland and Otimo as delineated in the second and third claims for relief.

107. Stotland and Otimo reasonably relied on these material misrepresentations as stated herein.

108. As a result of said reasonable reliance, Otimo has suffered damages in an amount to be determined at trial.

WHEREFORE: Otimo Music Inc. respectfully requests that this Court enter judgment against Defendants as follows:

A. Judgment for breach of contract against Royalty Exchange, Inc. in an amount to be proven at trial, including an award of reliance damages;

B. Rescission of the Purchase Agreement, plus an award of attorney's fees and costs against MIH pursuant to Paragraph 12 of the Purchase Agreement, plus an award of pre-judgment interest, post-judgment interest, and reasonable attorney's fees and costs against all defendants pursuant to C.R.S. § 11-51-604.

C. In the alternative to Rescission, an award of damages pursuant to C.R.S. § 11-51-604(3), or in the alternative, C.R.S. 11-51-604(3) in an amount to be proven at trial, plus an award of attorney's fees and costs against MIH pursuant to Paragraph 12 of the Purchase Agreement, plus an award of pre-judgment interest, post-judgment interest, and reasonable attorney's fees and costs against all defendants pursuant to C.R.S. § 11-51-604.

D. In the alternative to Rescission, an award of damages in connection with Otimo's Sixth Claim for Relief, including punitive damages; and

E. Such other and further relief this Court deems to be just and proper.

## JURY DEMAND

Otimo Music, Inc. respectfully demands a jury trial on all issues so triable.

DATED: November 24, 2017.                    Respectfully submitted,


/s  *William C. Groh, III*
Thomas P. Howard, No. 031684
William C. Groh, III, No. 43577
THOMAS P. HOWARD, LLC
842 W. South Boulder Road, Suite 100
Louisville, CO 80027
(303) 665–9845
Fax – (303) 665–9847
thoward@thowardlaw.com
wcgroh@thowardlaw.com
Attorneys for Plaintiff





# Terms of Use

Terms of Use

Last Updated: January 6, 2017

The following terms of use ("Terms of Use") apply to your use of the service (the "Service") operated by Royalty Exchange, Inc. and its affiliates and subsidiaries ("Company," "we," "us," or "our"). By accessing our website and any of its pages (the "Site"), you (the "User") signify that you have read, understand, and agree to be bound by these Terms of Use.

In addition to these Terms of Use, you may enter other agreements that govern your use of the Service. If there is any contradiction between these Terms of Use and another agreement you enter applicable to specific aspects of the Service, the other agreement shall take precedence in relation to the specific aspects of the Service to which it applies.

## CHANGES TO THESE TERMS OF USE

We may make changes to these Terms of Use from time to time. If we do this, we will notify you via the email address listed in your account, post the changed Terms of Use on the Site, and will indicate at the top of this page the date the Terms of Use were last revised. You understand and agree that your continued use of the Service or the Site after we have made any such changes constitutes your acceptance of the new Terms of Use.

## ELIGIBILITY

This Site is intended solely for Users who are 18 years of age or older and use of the Site by anyone under 18 is a violation of these Terms of Use. By using the Service or the Site, you state that you are 18 or older and that you agree to and abide by these Terms of Use. If you violate any of these Terms of Use or otherwise violate an agreement between you and us, the Company may terminate your account, delete your profile and any content or information you have posted on the Site, and prohibit you from using or accessing the Service or the Site.

## REGISTRATION DATA; ACCOUNT SECURITY

In consideration of your use of the Site, you agree to (a) provide accurate, current, and complete information about you as may be prompted by any registration forms on the Site ("Registration Data"); and (b) maintain the security of your password and identification; and (c) maintain and promptly update the Registration Data, and any other information you provide to the Company, to keep it accurate, current, and complete; and (d) be fully responsible for all use of your account and for any actions that take place using your account.

## MARKETPLACE LISTINGS

The Site is maintained for the personal use of its visitors and we cannot guarantee the completeness or accuracy of any information presented on any of its pages. We do not make investment recommendations or provide legal, tax, or financial advice. No communication should be considered a recommendation of any investment opportunity and there can be no assurance that any investment valuation is accurate or that any investment opportunity is suitable for any particular investor. Any of your decisions based upon the information contained on the Site are your sole responsibility.

You hereby acknowledge and agree that you have the sole responsibility to examine all information concerning the investment opportunities on the Site. You further agree that you will make an independent evaluation of the investment opportunities and acknowledge that we have made no statements or representations concerning the present or future value of the future income, costs or profits, if any, to be derived from the opportunities.

You acknowledge that Company is a third party intermediary and that all marketplace listings and the information presented therein are the seller's sole responsibility. Our Services shall not be deemed to create any duty, fiduciary or otherwise, to you through your use of the Site and our Service.



responsibility therefore, (b) if requested, shall sign a confirmation of purchase, and (c) shall pay the purchase price in full within two business days following the close of the auction.

If you fail to comply with the foregoing conditions, in addition to other remedies available to the Company by law, including without limitation, the right to hold you liable for the purchase price, the Company at our option may either (a) cancel the sale or (b) resell the right or item, either publicly or privately, and in such event you may be liable for the payment of any deficiency plus all costs and expenses associated with the sale, the Company's commission at our standard rates, all other charges due hereunder, attorney's fees, and incidental damages. If you fail to honor your binding bid, Company may also terminate your account and remove your ability to bid on further auctions.

If you fail to promptly pay all fees, commissions, bid price and other sums due to us as provided in these Terms of Use, we reserve the right to impose a finance charge equal to 1.5% per month on all amounts due to us beginning on the 31st day following the sale until payment of the total amount due is received, in addition to other remedies available to us by law.

You acknowledge that any royalties purchased on our Site but not paid by Royalty Exchange are due from the underlying royalty distributor, and you agree that Royalty Exchange is not liable for underpayment or nonpayment of royalties. In the event that the seller or its distributor defaults for any reason, your sole remedy is against the seller or its distributor only.

## DISCLAIMER OF WARRANTIES

We do not guarantee, represent or warrant that your use of the Service will be uninterrupted, timely, secure or error-free. We reserve the right to resolve any errors in the Service by any means at our sole discretion.

We do not warrant that the results that may be obtained from the use of the Service will be accurate or reliable.

You agree that from time to time we may remove the Service for indefinite periods of time or cancel the Service at any time, without notice to you.

You expressly agree that your use of, or inability to use, the Service is at your sole risk. The Service and all products and services delivered to you through the Service are (except as expressly stated by us) provided 'as is' and 'as available' for your use, without any representation, warranties or conditions of any kind, either express or implied, including all implied warranties or conditions of merchantability, merchantable quality, fitness for a particular purpose, durability, title, and non-infringement.

## SECURITIES MATTERS

Nothing in these Terms of Use shall be considered a waiver that would be impermissible under Section 14 of the Securities Act of 1933, (the "Securities Act") Section 29(a) of the Securities Exchange Act of 1934, or any other applicable provision of federal and state securities laws.

## PROPRIETARY RIGHTS IN SITE CONTENT; LIMITED LICENSE

Provided that you are eligible for use of the Site, you are granted a limited license to access and use the Site and to download or print a copy of any portion of the Site Content solely for your personal use, provided that you keep all copyright or other proprietary notices intact. Except for your own User Content (as defined below), you may not republish Site Content on any Internet, Intranet or Extranet site or incorporate the information in any other database or compilation, and any other use of the Site Content is strictly prohibited. Any use of the Site or the Site Content other than as specifically authorized herein, without the prior written permission of the Company, is strictly prohibited and will terminate the license granted herein. Such unauthorized use may also violate applicable laws including without limitation copyright and trademark laws and applicable communications regulations and statutes. Unless explicitly stated herein, nothing in these Terms of Use shall be construed as conferring any license to intellectual property rights, whether by estoppel, implication, or otherwise. This license is revocable by us at any time without notice and with or without cause.

## RESTRICTIONS ON DATA COLLECTION/TERMINATION

Without our prior consent, you may not:



- frame the Site, utilize framing techniques to enclose any Content or other proprietary information, place pop-up windows over this Site's pages, or otherwise affect the display of this Site's pages;

- engage in the practices of "screen scraping," "database scraping" or any other activity with the purpose of obtaining content or other information; or

- use this Site in any manner that violates applicable law or that could damage, disable, overburden, or impair this Site or interfere with any other party's use and enjoyment of this Site.

We may terminate or disable your access to, or use of, this Site and the Services for any reason, including without limitation, if we believe that you have violated or acted inconsistently with any portion of these Terms of Use.

## TRADEMARKS

Royalty Exchange and other Company graphics, logos, designs, page headers, button icons, scripts and service names are trademarks or trade dress of the Company in the U.S. and other countries. The Company's trademarks and trade dress shall not be used, including as part of trademarks and as part of domain names, in connection with any product or service in any manner that is likely to cause confusion and may not be copied, imitated, or used, in whole or in part, without the prior written permission of the Company.

## USER REPRESENTATIONS

You state that no materials of any kind submitted through your account or otherwise posted or shared by you through the Service will violate or infringe upon the rights of any third party, including copyright, trademark, privacy, publicity or other personal or proprietary rights; or contain libelous, defamatory or otherwise unlawful material. You further agree not to harvest or collect email addresses or other contact information of Users from the Service or the Site by electronic or other means for the purposes of sending unsolicited emails or other unsolicited communications. Additionally, you agree not to use automated scripts to collect information from the Service or the Site or for any other purpose. You further agree that you may not use the Service or the Site in any unlawful manner or in any other manner that could damage, disable, overburden or impair the Site. In addition, you agree not to use the Service or the Site to:

- upload, post, transmit, share, store or otherwise make available any content that we deem to be harmful, threatening, unlawful, defamatory, infringing, abusive, inflammatory, harassing, vulgar, obscene, fraudulent, invasive of privacy or publicity rights, hateful, or racially, ethnically or otherwise objectionable;

- register for more than one User account, register for a User account on behalf of an individual other than yourself, or register for a User account on behalf of any group or entity;

- impersonate any person or entity, or falsely state or otherwise misrepresent yourself, your age or your affiliation with any person or entity;

- upload, post, transmit, share or otherwise make available any unsolicited or unauthorized advertising, solicitations, promotional materials, "junk mail," "spam," "chain letters," "pyramid schemes," or any other form of solicitation;

- upload, post, transmit, share, store or otherwise make publicly available on the Site any private information of any third party, including, without limitation, addresses, phone numbers, email addresses, Social Security numbers and credit card numbers;



- upload, post, transmit, share or otherwise make available any material that contains software viruses or any other computer code, files or programs designed to interrupt, destroy or limit the functionality of any computer software or hardware or telecommunications equipment;

- intimidate or harass another user;

- upload, post, transmit, share, store or otherwise make available content that would constitute, encourage or provide instructions for a criminal offense, violate the rights of any party, or that would otherwise create liability or violate any local, state, national or international law;

- use or attempt to use another's account, service or system without authorization from the Company, or create a false identity on the Service or the Site.

- upload, post, transmit, share, store or otherwise make available content that, in the sole judgment of the Company, is objectionable or which restricts or inhibits any other person from using or enjoying the Site, or which may expose the Company or its Users to any harm or liability of any type.

## USER CONTENT POSTED ON THE SITE

You are solely responsible for the photos, profiles, messages, notes, text, information, music, video, contact information for you or others, advertisements or other content that you upload, publish, provide or display on or through the Service or the Site, or transmit to or share with other Users (collectively the "User Content"). It is against the Terms of Use to contact Users directly or to attempt to enter into any transactions with Users outside of the Service. You understand and agree that the Company may, but is not obligated to, review and delete or remove (without notice) any User Content in its sole discretion, including without limitation, User Content that in the sole judgment of the Company violates these Terms of Use, might be offensive or illegal, or might violate the rights of, harm, or threaten the safety of, Users or others.

By posting User Content to any part of the Site, you automatically grant, and you represent and warrant that you have the right to grant, to the Company an irrevocable, perpetual, non-exclusive, transferable, fully paid, worldwide license (with the right to sublicense) to use, copy, publicly perform, publicly display, reformat, translate, excerpt (in whole or in part) and distribute such User Content for any purpose on or in connection with the Site or the promotion thereof, to prepare derivative works of, or incorporate into other works, such User Content, and to grant and authorize sublicenses of the foregoing. You may remove your User Content from the Site at any time. If you choose to remove your User Content, the license granted above will not expire.

## COPYRIGHT COMPLAINTS

If you believe that any material on the Site infringes upon your copyright, you may send a written notification of such infringement to:

Address: Attention: Copyright Agent The Royalty Exchange, 1550 Larimer St. #769 Denver, CO 80202

Facsimile Number: (800)-370-9956

Email Address: info@royaltyexchange.com

To meet the notice requirements under the Digital Millennium Copyright Act, the notification must be a written communication that includes the following:

1. A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;



3.  Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit us to locate the material;

4.  Information reasonably sufficient to permit us to contact the complaining party, such as an address, telephone number and, if available, an electronic mail address at which the complaining party may be contacted;

5.  A statement that the complaining party has a good-faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent or the law; and

6.  A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

## REPEAT INFRINGER POLICY

In accordance with the Digital Millennium Copyright Act (DMCA) and other applicable law, the Company has adopted a policy of terminating, in appropriate circumstances and at the Company's sole discretion, the accounts of Users who are deemed to be repeat infringers. The Company may also at its sole discretion limit access to the Site and/or terminate the accounts of any Users who infringe any intellectual property rights of others, whether or not there is any repeat infringement.

## LINKS TO OTHER WEB SITES AND CONTENT

The Site contains (or you may be sent through the Site or the Services) links to other web sites ("Third Party Sites"), as well as articles, photographs, text, graphics, pictures, designs, music, sound, video, information, software and other content belonging to or originating from third parties (the "Third Party Content"). Such Third Party Sites and Third Party Content are not investigated, monitored or checked for accuracy, appropriateness, or completeness by us, and we are not responsible for any Third Party Sites accessed through the Site or any Third Party Content posted on the Site, including without limitation the content, accuracy, offensiveness, opinions, reliability or policies of or contained in the Third Party Sites or the Third Party Content. Inclusion of or linking to any Third Party Site or any Third Party Content does not imply approval or endorsement thereof by us. If you decide to leave the Site and access the Third Party Sites, you do so at your own risk and you should be aware that our terms and policies no longer govern, except to the extent otherwise set forth in "Bidding on an Auction" above. You should review the applicable terms and policies, including privacy and data gathering practices, of any site to which you navigate from the Site.

## PRIVACY

Please review our Privacy Policy, which also governs your use of the Site and the Service, to understand our practices.

## DISCLAIMERS

The Company does not guarantee the accuracy of any User Content or Third Party Content. Although we provide rules for User conduct and postings, we do not control and are not responsible for what Users post on the Site and are not responsible for any offensive, inappropriate, obscene, unlawful or otherwise objectionable content you may encounter on the Site or in connection with any User Content or Third Party Content. The Company is not responsible for the conduct, whether online or offline, of any User of the Site or Service. The Company cannot guarantee and does not promise any specific results from use of the Site or Service.

The Site and the Service may be temporarily unavailable from time to time for maintenance or other reasons. The Company assumes no responsibility for any error, omission, interruption, deletion, defect, delay in operation or transmission, communications line failure, theft or destruction or unauthorized access to, or alteration of, User communications. The Company is not responsible for any problems or technical malfunction of any telephone network or lines, computer online systems, servers or providers, computer equipment, software, failure of email or players on account of technical problems or traffic congestion on the Internet or on the Site or combination thereof, including injury or damage to Users or to any other person's computer related to or resulting from participating or downloading materials in connection with the Web and/or in connection with the Service. Under no circumstances will the Company be responsible for any loss or damage, including any loss or damage to any User Content or personal injury or death, resulting from anyone's use of the Site or the Service, any User Content or Third Party Content posted on or through the Site or the Service or transmitted to Users, or any interactions between Users of the Site, whether online or offline.



therewith, by the Company.

## LIMITATION ON LIABILITY

EXCEPT IN JURISDICTIONS WHERE SUCH PROVISIONS ARE RESTRICTED AND EXCEPT AS PROVIDED ABOVE IN THE PARAGRAPH TITLED, " SECURITIES MATTERS", IN NO EVENT WILL THE COMPANY OR ITS DIRECTORS, EMPLOYEES OR AGENTS BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, INCIDENTAL, SPECIAL OR PUNITIVE DAMAGES, INCLUDING FOR ANY LOST PROFITS OR LOST DATA ARISING FROM YOUR USE OF THE SITE OR THE SERVICE OR ANY OF THE SITE CONTENT OR OTHER MATERIALS ON OR ACCESSED THROUGH THE SITE, EVEN IF THE COMPANY IS AWARE OR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN EXCEPT AS PROVIDED ABOVE IN THE PARAGRAPH TITLED, " SECURITIES MATTERS", TO THE EXTENT PERMITTED BY APPLICABLE LAW THE COMPANY'S LIABILITY TO YOU FOR ANY CAUSE WHATSOEVER, AND REGARDLESS OF THE FORM OF THE ACTION, WILL AT ALL TIMES BE LIMITED TO THE AMOUNT PAID, IF ANY, BY YOU TO THE COMPANY FOR THE SERVICE. IN NO CASE, EXCEPT AS PROVIDED ABOVE IN THE PARAGRAPH TITLED, " SECURITIES MATTERS", WILL THE COMPANY'S LIABILITY TO YOU EXCEED $100. YOU ACKNOWLEDGE THAT IF NO FEES ARE PAID TO THE COMPANY FOR THE SERVICE, YOU SHALL BE LIMITED TO INJUNCTIVE RELIEF ONLY, UNLESS OTHERWISE PERMITTED BY LAW, AND SHALL NOT BE ENTITLED TO DAMAGES OF ANY KIND FROM THE COMPANY, REGARDLESS OF THE CAUSE OF ACTION.

IN ADDITION TO THE SPECIFIC SECURITIES LAWS PROVISIONS DESCRIBED ABOVE IN THE PARAGRAPH TITLED, "SECURITIES MATTERS", CERTAIN FEDERAL AND STATE LAWS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF CERTAIN DAMAGES OR LIMITATIONS ON IMPLIED WARRANTIES. IF THESE LAWS APPLY TO YOU, SOME OR ALL OF THE ABOVE DISCLAIMERS, EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU, AND YOU MAY HAVE ADDITIONAL RIGHTS.

## GOVERNING LAW; VENUE AND JURISDICTION

The laws of the State of Colorado govern all matters arising from these Terms of Use and the exclusive forum shall be a federal or state court in Denver County, Colorado.

## INDEMNITY

You hereby indemnify Company, its subsidiaries and affiliates, and each of their directors, officers, agents, contractors, partners and employees, against all losses and liabilities, including reasonable attorney's fees, arising out of or in connection with your use of the Service or the Site, your User Content, any Third Party Content you post or share on or through the Site, your conduct in connection with the Service or the Site or with other Users of the Service or the Site, or any violation of these Terms of Use or of any law or the rights of any third party.

## SUBMISSIONS

You acknowledge and agree that any questions, comments, suggestions, ideas, feedback or other information about the Site or the Service ("Submissions"), provided by you to the Company are non-confidential and shall become the sole property of the Company. The Company shall own exclusive rights, including all intellectual property rights, and shall be entitled to the unrestricted use and dissemination of these Submissions for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

## OTHER

The failure of the Company to exercise or enforce any right or provision of these Terms of Use shall not constitute a waiver of such right or provision in that or any other instance. If any provision of these Terms of Use is held invalid, the remainder of these Terms of Use shall continue in full force and effect. If any provision of these Terms of Use shall be deemed unlawful, void or for any reason unenforceable, then that provision shall be deemed severable from these Terms of Use and shall not affect the validity and enforceability of any remaining provisions.





+1-800-718-2269

Copyright © 2017 Royalty Exchange All Rights Reserved.

1550 Larimer St. #769 Denver, CO 80202 U.S.

Use of this website constitutes acceptance of the Terms of Use and Privacy Policy. Designated trademarks and brands are the property of their respective owners.

IMPORTANT DISCLOSURES
This website (the "Site") is operated by Royalty Exchange. By accessing the Site and any of its pages, you agree to be bound by its Terms of Use and Privacy Policy. The Site is maintained for the personal use of its visitors and Royalty Exchange cannot guarantee the completeness or accuracy of any information presented on any of its pages. Royalty Exchange does not make investment recommendations or provide legal, tax, or financial advice. No communication should be considered a recommendation of any investment opportunity and there can be no assurance that any investment valuation is accurate or that any investment opportunity is suitable for any particular investor.

Terms of Use | Royalty Exchange

Terms of Use | Royalty Exchange

Terms of Use | Royalty Exchange

EXHIBIT

2

_____

exhibitsticker.com

# LISTING AGREEMENT

This listing agreement is dated <u>06/28/2017</u>, and is between ROYALTY EXCHANGE, INC., a Delaware corporation ("**Company**"), and MIH ENTERTAINMENT, LLC, a California limited liability company ("**Seller**"). This agreement amends and wholly replaces the listing agreement between the parties dated March 3, 2017.

Seller owns an interest in the royalty or income stream indicated in exhibit A ("**Asset**").

Company owns and operates a marketplace that attracts and educates investors to facilitate sales of royalty and income streams.

Seller wants to retain Company to exclusively list the Asset for sale on Company's marketplace.

The parties therefore agree as follows:

**1.** **Term.** The rights and obligations of the parties begin on the date stated above and end upon (1) the Closing of the sale of the Asset; or (2) either party's written notice to the other party of its intent to terminate this agreement, except that Seller shall not terminate during the three-month period after the execution date of this agreement. A sale is considered closed when the Net Proceeds of the sale have been disbursed to Seller ("**Closing**").

**2.** **Seller's Obligations and Statements of Fact.**

**2.1** **Information.** In order to facilitate the Closing, Seller shall provide all information reasonably requested by Company, and all information provided shall be complete and accurate. Seller acknowledges that information provided may be posted on Company's marketplace and made available to third parties for review. If Company determines information provided by Seller to be incomplete or inaccurate, Company may terminate this agreement. Except as necessary in the purchase agreement and closing documents, Company shall use reasonable efforts to prevent the disclosure of Seller's company name in the marketplace listing and in communications with media and prospective investors, including telephone calls and email correspondence.

**2.2** **Starting Price and Obligation to Sell.** Seller shall set a starting price for the Asset, which is the minimum amount that Seller is willing to accept in a sale ("**Starting Price**"). Seller may reduce the Starting Price at any time. Seller shall sell the Asset to the bidder who makes the highest bid at or above the Starting Price ("**Winning Bid**"). When a Winning Bid is

declared, Seller shall promptly take all steps necessary to transfer the Asset to the buyer, including but not limited to signing documents, giving notices, and providing information ("**Transfer Steps**"). Seller shall not bid itself or cause another to bid on Seller's own Asset.

**2.3** **Nonperformance Damages** If Seller fails to promptly complete the Transfer Steps after a Winning Bid is declared, Company will notify Seller of Seller's nonperformance. No later than seven days after Company's notice to Seller of Seller's nonperformance, Seller shall either complete the Transfer Steps or pay Company the fee indicated in section 5 as damages. This section does not apply if Seller is unable to complete the Transfer Steps through no fault of its own.

**2.4** **Statements of Fact** Seller states that it is the sole owner the Asset and has full authority to enter this agreement and sell the Asset. Seller also states that the Asset is free and clear from all encumbrances and to Seller's knowledge the performance of its obligations does not infringe the rights of any third party.

**3.** **Marketplace Listing.** All information presented in the marketplace listing is Seller's sole responsibility. Before Company makes the Asset available for bid on the marketplace, Seller shall review the proposed listing and confirm in writing that all information presented is complete and accurate. Company may withdraw the Asset from the marketplace if the Starting Price is not met within 15 days after Company makes the Asset available for bid.

**4.** **Exclusivity.** Seller shall not attempt to sell the Asset outside of this agreement. If Seller sells the Asset during the three-month period after the execution date of this agreement, Seller shall pay Company the fee indicated in section 5 no later than 15 days after the sale.

**5.** **Company Fee.** When the Asset is sold under this agreement or against the exclusivity provision in section 4, Seller shall pay Company a fee of 15% of the Winning Bid, payable out of the Seller's proceeds of the sale.

**6.** **Next Distribution Escrow.** Seller acknowledges that all income for the Asset paid after July 31, 2017, regardless of when earned, will belong to the buyer, and that Seller's distributors may not change the payee in time for the next distribution. To ensure that the buyer properly receives all income paid after July 31, 2017, Seller agrees that Company will withhold, in escrow, 10% of the Winning Bid from Seller's proceeds until Company confirms that the buyer properly received the next distribution. No later than 72 hours after Company confirms whether the buyer properly received the next distribution, Company will release the escrowed

amount to Seller, less any amount that should have been paid to the buyer.

**7.**     **Disbursement of Proceeds.**Company will disburse the "**Net Proceeds**" of the sale, which equals the Winning Bid minus the Company Fee, Holding Fee, and next distribution escrow, to Seller no later than 72 hours after Company verifies that Seller's royalty distributors has confirmed the transfer of the Asset to the buyer.

**8.**     **Indemnification.**Seller shall indemnify and defend Company against all losses and liabilities, including reasonable attorneys' fees, related to Seller's provision and omission of information and Seller's statements of fact in section 2.

**9.**    **No Advice by Company.**Seller acknowledges that Company is not a law, financial, or tax firm and does not provide legal, financial, or tax advice. Seller states that it has had sufficient opportunity to consult with its own legal counsel, financial advisors, and tax advisors regarding the sale of the Asset.

**10.**    **Miscellaneous.**

     **10.1**     **Governing Law and Forum**The laws of the State of Colorado govern all matters arising from this agreement and the exclusive forum shall be a federal or state court in Denver County, Colorado.

     **10.2**     **Entirety and Amendment**This agreement constitutes the entire understanding of the parties and no amendment will be valid unless it is in writing and signed by both parties.

     **10.3**     **Assignment**Seller shall not assign this agreement without Company's prior written consent.

     **10.4**     **Conditional Purchase Agreement.**Simultaneously with signing this agreement, the parties shall sign a conditional purchase agreement ("**Conditional Agreement**"), whereby Seller will assign the Asset to Company.The intent of the parties is that the Conditional Agreement will become effective only if (1) Seller fails to respond within seven days after Company's request for Seller to approve the marketplace listing; or (2) a Winning Bid is declared and Seller fails to complete the Transfer Steps within seven days after Company's notice to Seller of Seller's nonperformance according to Section 2.3. In exchange for Seller signing the Conditional Agreement and its accompanying letters of direction, Company will pay to Seller $50,000.00 (**"Holding Fee"**), plus 85% of the Winning Bid (less the Holding Fee) for any sale by Company of the Asset after the Conditional Agreement becomes effective. If the

Conditional Agreement becomes effective and Company does not sell the Asset to a third party on or before September 30, 2017, Seller shall have the option to repurchase the Asset from Company for $50,000.00.

**10.5    Conditional Letter of Direction.** Simultaneously with signing this agreement, the parties shall sign a conditional letter of direction ("**Conditional LoD**"), whereby Seller will assign royalty payments (excluding copyright ownership) for the Asset to Seller. The intent of the parties is that the Conditional LoD will become effective only if the Conditional Agreement does not become effective on or before September 30, 2017. If the Conditional LoD becomes effective, Company will use it solely to recover the Holding Fee plus $5,000, for a total of $55,000 ("**Recoupment Total**"), from Seller's distributors. Promptly after Company recovers the Recoupment Total, the parties shall notify Seller's distributors that the royalty payments for the Asset shall return to Seller.

The parties are signing this agreement on the date stated in the introductory clause.


ROYALTY EXCHANGE, INC.                    MIH ENTERTAINMENT, LLC


By:  *Jeff Schneider*                    By:  *Michael Conner*

     Jeff Schneider                           Michael Conner
     Chief Financial Officer                  Managing Member

**Exhibit A**

**Asset:** 100% of Seller's interest in the musical composition, sound recording, and master video copyrights and all related royalties

**Starting Price:** $350,000

**Company Fee:** 15%

**Exhibit B**

| Artist Name | Release Name | Track Name | UPC | ISRC |
|---|---|---|---|---|
| King Lil G | 90's Kid | 9'6 (feat. Emc Senatra) | 97037051099 | USASN1500312 |
| King Lil G | 90's Kid | Eternal West Coast (feat. Chikk) | 97037051099 | USASN1500309 |
| King Lil G | 90's Kid | Gang Signs | 97037051099 | USASN1500313 |
| King Lil G | 90's Kid | Get High (feat. Krypto) | 97037051099 | USASN1500306 |
| King Lil G | 90's Kid | Graff Intro | 97037051099 | USASN1500301 |
| King Lil G | 90's Kid | Grow Up (feat. Chikk) | 97037051099 | USASN1500303 |
| King Lil G | 90's Kid | House Party (Skit) | 97037051099 | USASN1500310 |
| King Lil G | 90's Kid | Ignorance | 97037051099 | USASN1500302 |
| King Lil G | 90's Kid | Mistakes | 97037051099 | USASN1500314 |
| King Lil G | 90's Kid | More Bounce (feat. Young Drummer Boy & 2-Tone) | 97037051099 | USASN1500311 |
| King Lil G | 90's Kid | No Reason | 97037051099 | USASN1500307 |
| King Lil G | 90's Kid | Same Ones | 97037051099 | USASN1500308 |
| King Lil G | 90's Kid | That Loud | 97037051099 | USASN1500305 |
| King Lil G | 90's Kid | Weed 4 the Low (feat. Self Provoked & La Gun Smoke) | 97037051099 | USASN1500304 |
| King Lil G | Ak47boyz | Ak47 | 97037101404 | USASN1401184 |
| King Lil G | Ak47boyz | Blunt After Blunt (feat. Reverie) | 97037101404 | USASN1401192 |
| King Lil G | Ak47boyz | Can't Relate | 97037101404 | USASN1401185 |
| King Lil G | Ak47boyz | Delusional | 97037101404 | USASN1401187 |
| King Lil G | Ak47boyz | Dirty (feat. | 97037101404 | USASN1401189 |

| | | Drummer Boy) | | |
|---|---|---|---|---|
| King Lil G | Ak47boyz | El Apachino (feat. La Gun Smoke) | 97037101404 | USASN1401188 |
| King Lil G | Ak47boyz | Hopeless Boy (feat. David Ortiz) | 97037101404 | USASN1401183 |
| King Lil G | Ak47boyz | Joey and Jasmine | 97037101404 | USASN1401190 |
| King Lil G | Ak47boyz | Like That (feat. Baby Gunz & Drummer Boy) | 97037101404 | USASN1401191 |
| King Lil G | Ak47boyz | Living My Life (feat. Isuppose, Self Provoked & Carolyn Rodriguez) | 97037101404 | USASN1401194 |
| King Lil G | Ak47boyz | Love Kills (feat. Krypto) | 97037101404 | USASN1401193 |
| King Lil G | Ak47boyz | Make You Mine (feat. Carolyn Rodriguez) | 97037101404 | USASN1401195 |
| King Lil G | Ak47boyz | Windows Down (feat. Drummer Boy) | 97037101404 | USASN1401186 |
| Lil G | Blue Devil Part 2 | Bangin' on Em (feat. Baby Gunz) | 97037094317 | USASN1200414 |
| Lil G | Blue Devil Part 2 | Black Cortez | 97037094317 | USASN1200415 |
| Lil G | Blue Devil Part 2 | Fallin in Love | 97037094317 | USASN1200416 |
| Lil G | Blue Devil Part 2 | Gunz in My Neighborhood | 97037094317 | USASN1200417 |
| Lil G | Blue Devil Part 2 | Letter to Dr. Dre (feat. Big Swiisha) | 97037094317 | USASN1200418 |
| Lil G | Blue Devil Part 2 | Love La | 97037094317 | USASN1200419 |
| Lil G | Blue Devil Part 2 | Pussy Is a Drug | 97037094317 | USASN1200420 |
| Lil G | Blue Devil Part 2 | Real Life | 97037094317 | USASN1200421 |
| Lil G | Blue Devil Part 2 | Sending This Message | 97037094317 | USASN1200422 |

| Lil G | Blue Devil Part 2 | Sucios Part 2 | 97037094317 | USASN1200423 |
|-------|-------------------|---------------|-------------|--------------|
| Lil G | Blue Devil Part 2 | This Is My Life | 97037094317 | USASN1200424 |
| King Lil G | Grow Up - Single | Grow Up | 97037045296 | USASN1500001 |
| King Lil G | King Enemy | Alkahol | 97037001605 | USASN1201245 |
| King Lil G | King Enemy | Boom Boom Killa (feat. Baby Gunz) | 97037001605 | USASN1201246 |
| King Lil G | King Enemy | Crush on You (feat. Mike Ness) | 97037001605 | USASN1201254 |
| King Lil G | King Enemy | Forget Your Boyfriend | 97037001605 | USASN1201253 |
| King Lil G | King Enemy | Fuck Lil G (feat. Krypto) | 97037001605 | USASN1201242 |
| King Lil G | King Enemy | Gun Smoke | 97037001605 | USASN1201249 |
| King Lil G | King Enemy | I Don't Give a Fuck | 97037001605 | USASN1201248 |
| King Lil G | King Enemy | If You Don't Know | 97037001605 | USASN1201247 |
| King Lil G | King Enemy | I'm Your Enemy (feat. Big Swiisha) | 97037001605 | USASN1201238 |
| King Lil G | King Enemy | Make Em Clap (feat. 2Tone) | 97037001605 | USASN1201250 |
| King Lil G | King Enemy | Midnite (feat. David Ortiz) | 97037001605 | USASN1201251 |
| King Lil G | King Enemy | Narco Corridos | 97037001605 | USASN1201240 |
| King Lil G | King Enemy | Out to Get Me (feat. RC & PJ The Gator) | 97037001605 | USASN1201241 |
| King Lil G | King Enemy | Psycho | 97037001605 | USASN1201252 |
| King Lil G | King Enemy | Roll with a Strap (feat. Big Swiisha) | 97037001605 | USASN1201244 |
| King Lil G | King Enemy | Talk about Me | 97037001605 | USASN1201243 |
| King Lil G | King Enemy | Who Shot 2Pac | 97037001605 | USASN1201239 |
| King Lil G | Lost in Smoke | Do You Think of Me | 97037070700 | USASN1302111 |

| King Lil G | Lost in Smoke | El Stilo De Mafia | 97037070700 | USASN1302112 |
| King Lil G | Lost in Smoke | Fan Mail | 97037070700 | USASN1302109 |
| King Lil G | Lost in Smoke | Fuck 'Em Like I Love 'Em | 97037070700 | USASN1302116 |
| King Lil G | Lost in Smoke | Fuck You Wanna Bee's | 97037070700 | USASN1302114 |
| King Lil G | Lost in Smoke | Gods Looking for Me | 97037070700 | USASN1302117 |
| King Lil G | Lost in Smoke | Killuminati Won't Save You | 97037070700 | USASN1302107 |
| King Lil G | Lost in Smoke | Liquor Store | 97037070700 | USASN1302115 |
| King Lil G | Lost in Smoke | Mob Life | 97037070700 | USASN1302108 |
| King Lil G | Lost in Smoke | That Dro | 97037070700 | USASN1302110 |
| King Lil G | Lost in Smoke | Welcome to La | 97037070700 | USASN1302113 |
| King Lil G | Lost in Smoke | What's Up | 97037070700 | USASN1302106 |

**EXHIBIT**

3

Melinda Romines, [SBN 302958]
LAW OFFICE OF MELINDA C. ROMINES
3532 Katella Ave, Suite 214
Los Alamitos, CA 90720
Phone: (714) 924-4829
Fax: (714) 333-4821
Email: melro.law@gmail.com

Attorneys for Plaintiff:
ALEX GONZALEZ VELASQUEZ p/k/a KING LIL G

FILED
Superior Court of California
County of Los Angeles

MAR 07 2017

Sherri R. Carter, Executive Officer/Clerk
By _____ Deputy
Nancy Alvarez

1) Jo Dalila Corral Lyons

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ALEX GONZALEZ VELAZQUEZ p/k/a KING LIL G, an individual, <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL W. CONNER, JR., an individual; MIH ENTERTAINMENT, LLC., a California Limited Liability Company; and DOES 1 THROUGH 10, inclusive, et. al. <br><br> Defendant | Case No.: **BC 653688** <br><br> **PLAINTIFF'S COMPLAINT FOR:** <br><br> **(1) BREACH OF FIDUCIARY DUTY** <br><br> **(2) CONSTRUCTIVE FRAUD** <br><br> **(3) BREACH OF CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** |

Complainant Alex Gonzalez Velasquez p/k/a King Lil G ("Alex"), individually allege against Michael W. Conner, Jr. ("Conner") and MIH ENTERTAINMENT, LLC ("MIH"), and DOES 1 through 10, inclusive, and each of them (collectively, the "Defendants"), as follows:

## NATURE OF THE ACTION

1.      King Lil G ("KLG") is a popular and flourishing hip-hop artist. KLG's music is followed by thousands of fans on social media. KLG's online music and video releases are viewed by thousands of fans and his popularity increases with each new release. KLG's digital imprint is exceeding initial expectations evident by the sizable downloads, and streams from the

RECEIPT #: CCH451233012
DATE PAID: 03/09/20:24 AM
PAYMENT: $435.00
RECEIVED:
CHECK:          $0.00
CASH:           $0.00
CHANGE:         $0.00
CARD:           $435.00

CIT/CASE:
LEA/DEF#:       BC653688

310



internet, mobile or wireless networks, embeds, and/or other social media platforms which contain hosted and/or embedded music and videos. KLG is an ascending artist with monumental career potential.

2.      MIH Entertainment, Inc. is an entertainment, marketing and artist management company founded in 2007. Mr. Michael W. Conner, Jr. is the CEO, Chairman and shareholder of MIH Entertainment, Inc.

3.      Alex Gonzalez Velazquez is the original creator of the King Lil G persona owning the intellectual property and the rights reserved as creator and owner of King Lil G including, but not limited to (i) King Lil G's business and assets; (ii) the rights to the King Lil G name, trademarks and copyrights associated with King Lil G; and (iii) the right to license and exploit the King Lil G name. Mr. Alex Gonzalez Velazquez controls the operation and direction of the King Lil G brand.

4.      The Defendants pursued Alex to become part of the MIH Entertainment Group roster of artists promising to use the Defendant's contacts, experience and background to advise, guide, counsel, and direct Alex in the development of the KLG brand. Based on this representation AGV hired Conner and MIH to build and promote the KLG brand.

5.      The Defendants, devised and implemented a scheme to sabotage Alex's control and rights of the KLG brand without knowledge or consent from Alex and misappropriated revenue beyond the contractual agreement, for the Defendant's own benefit.

6.      In furtherance of this scheme, Defendants withheld appropriate accounting of all monthly gross earnings discernably delaying Alex's repeated reasonable requests and further delaying accurate accounting of applicable royalty revenue. Additionally, Defendants have actively and fraudulently misrepresented their contractual permission to third parties sabotaging Alex's ability to promote and exploit his KLG brand.

7.      Defendants thereby violated their contractual obligations and breached their fiduciary duties to Alex and the KLG brand causing hundreds of thousands of dollars in damages.

## PARTIES

8.      At all times mentioned herein, Alex was an individual residing in Los Angeles, California. Defendants owed and owe a fiduciary duty to Alex at all times alleged herein.

FAX FILING

9.      At all times mentioned herein, MIH was and is a California corporation with its principle place of business in Los Angeles, California. MIH is a party to KLG's recording agreements. Conner, and other Defendants, understood and acknowledged the purpose and structure of MIH and owed fiduciary duties to Alex at all times alleged herein.

10.     At all times mentioned herein, Conner was and is an individual residing in Los Angeles, California. From January 2013 to February 2017, Conner was and is a manager of King Lil G and has received commissions for his services. Conner owed, and owes, fiduciary duties to Alex.

11.     Alex is informed and believes, and on that basis allege, that at all relevant times mentioned herein, MIH was responsible for the management of KLG and the acts of Conner as set forth herein. MIH participated in the decision-making related to KLG. Conner acted in behalf of MIH while performing his duties as a manager of KLG. MIH knowingly and willingly ratified the actions of Conner and accepted the benefits those actions by receiving commission payments from KLG for the managerial services provided by Conner. At all relevant times, Conner acted as an agent for MIH and his actions alleged herein were within the scope of his duties owed to MIH.

12.     Alex is informed and believes, and on that basis allege, that Defendant Does 1 through 10, inclusive, are individually and/or jointly liable to KLG for the wrongs alleged herein. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 10, inclusive, are unknown to KLG at this time. Accordingly, KLG sues Defendants Does 1 through 10, inclusive, by fictitious names and will amend this Complaint to allege their true names and capacities after they are ascertained.

13.     Alex is informed and believes and thereupon alleges that each Defendant conspired with, aided and abetted, ratified the conduct of, knowingly acquiesced in and accepted the benefits of each other Defendant as alleged herein. KLG also alleges that Defendant Conner acted individually and alone in violating the rights of KLG and causing KLG to sustain damages.

14.     KLG is informed and believe, and on that basis allege, that except as otherwise alleged herein, each of the Defendants is, and at all times relevant to this Complaint was, the agent, employer, partner joint venture, alter ego, affiliate, and/or co-conspirator of the other Defendants and, in doing the things alleged herein, was acting within the course and scope of

FAX FILING

3

such positions at the direction of, and/or with permission, knowledge, consent, and/or ratification of the other Defendants.

15.    At all times relevant to this Complaint, the conduct giving rise to these claims occurred, in part, in the County of Los Angeles.

## FACTS COMMON TO ALL CAUSES OF ACTION

16.    Michael W. Conner, Jr. is identified as the Chief Executive Officer for MIH Entertainment, LLC in the Statement of Information filed with the Secretary of State for the State of California.

17.    On the 1st day of January, 2013, Alex as the agent and owner of the KLG brand entered into an Artist Management Agreement ("Agreement") with MIH Entertainment, LLC, a California limited liability company ("MIH") to act as personal manager to render advice, guidance, counsel, and direction to Alex for the development of the KLG brand.

18.    The terms of the Agreement provided for compensation to MIH equal to, but no more than, ten percent of KLG's gross monthly earnings.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty – Against All Defendants)

19.    Alex hereby repeats, realleges, and incorporates by this reference each and every allegation from paragraph 1 through 18 of this Complaint, as though these paragraphs were set forth in full herein.

20.    Relying on his representations, Alex hired Defendants, as KLG's manager. In or about January 2013, Alex and Defendants entered into an Agreement pursuant to which Defendant agreed to serve as KLG's manager. Pursuant to this Agreement, and by operation of law, Defendants became fiduciaries to Alex, and each owed an continue to owe fiduciary duties to Alex, the KLG brand, including the duties of loyalty, good faith and care.

20.    As managers, Defendant stood in relationship of confidentiality and trust to Alex and owed special duty to KLG, including the duties of loyalty, honesty, disclosure, good faith and fair dealing. Specifically, Conner and MIH owed KLG the duty not to favor their own interests, over the interests of Alex and the KLG brand.

FAX FILING

4



21.     Alex is informed and believes and upon that basis allege that, from January 2013 onward, Defendants breached their duties to Alex and the KLG brand by engaging in the following misconduct:

(a)     Not communicating in an open an honest way to Alex about the guidance and exploitation of the KLG brand;

(b)     Acting in furtherance of the plan of sabotaging Alex's ability to control and further develop the KLG brand;

(c)     Self-dealing and acting against the best interest of Complainant;

(d)     Failing to disclose the Defendants true motives behind the Agreement between Complainants and Defendants

(e)     Favoring Defendant's own interest over the interests of their fiduciaries; and

(f)     Delaying accounting to further Defendant's misappropriation of KLG's revenue for Defendants' own self interest.

22.     As a direct and proximate result of Defendants breaches of duties as set forth above, Alex and the KLG brand has suffered damages in an amount to be proven at trial, but believe to be in the excess of $150,000.00.

23.     Alex further alleges that Defendant engaged in despicable conduct as alleged with an intent to injure Alex and the KLG brand and subject them to unjust hardship in conscious disregard of their rights, and that said were done fraudulently, maliciously and oppressively. Therefore, Alex is entitled to recover punitive damages against Defendants in an amount sufficient to punish them for their despicable conduct.

## SECOND CAUSE OF ACTION
### (Constructive Fraud – Against all Defendants)

24.     Alex hereby repeat, reallege, and incorporate by this reference each and every allegation from paragraphs 1 through 23 of this Complaint, as though these paragraphs were set in full herein.

25.     As managers of KLG, Conner and MIH stood in a position of confidentiality and trust to Alex and the KLG brand and owed special duties, including the duties of loyalty, honesty, good faith and fair dealing.

FAX FILING

5

26. Defendants intentionally and knowingly misrepresented their true intentions in inducing Alex to hire Defendants as managers of the KLG brand.

27. Alex has consistently labored and relied upon the misimpression that Defendants were acting in the best interest of their fiduciary, when, in truth, they were formulating a plan that was developed solely for their own financial gain and aggrandizement; had the truth been disclosed, Alex could and would have taken action earlier to avoid injuries caused by Defendants.

28. As a direct and proximate result of Defendants' constructive fraud, as set forth above, Alex and the KLG brand suffered damages in an amount to be proven in trial, but believed to be in the excess of $150,000.00.

29. Alex further allege that Defendants engaged in despicable conduct as alleged with an intent to injure Alex and the KLG brand, and subject it to unjust hardship in conscious disregard of Alex's rights, and that said acts were done fraudulently, maliciously and oppressively. Therefore, Alex is entitled to recover punitive damages against Defendants in an amount sufficient to punish them for their despicable conduct.

### THIRD CAUSE OF ACTION

### (Breach of Contract – Against all Defendants)

30. Alex hereby repeat, reallege, and incorporate by this reference each and every allegation from paragraphs 1 through 29 of this Complaint, as though these paragraphs were set in full herein.

23. On or about January 2013, Alex as owner of the KLG brand entered into an Agreement with Defendants pursuant to which Defendants agreed to act as personal manager to render advice, guidance, counsel, and direction to Alex for the development of the KLG brand.

24. Alex has performed all conditions, covenants, and promises required on his part to be performed under the terms of the Agreement, except as excused or prevented by Defendants' material breaches.

25. Defendants failed to perform their obligations pursuant to the Agreement by failing to act in the best interest of Alex and the KLG brand, refusing to fulfill their duties and obligations to Alex and the KLG brand, failing to manage and coordinate accurate accounting of

FAX FILING

6

KLG's gross monthly revenue, and misleading Alex about the misappropriation of KLG's gross monthly revenue.

26.     Defendants materially breached the Agreement as set forth above.

27.     As a direct and proximate result of Defendants' breaches of conduct, as set forth above, Alex and the KLG brand suffered damages in an amount to be proven at trial, but believed to be in excess of $150,000.00.

## PRAYER

WHEREFORE, Plaintiff pray for judgments as follows:

As to the First and Second Causes of Action:

1.      For Compensatory and consequential damages in an amount to be proven at trial, believed to be in excess of $100,000.00;

2.      For pre- and post- judgment interest;

3.      For cost of suit;

4.      For disgorgement of commissions;

5.      For punitive, exemplary, and statutory damages;

As to the Third Cause of Action:

6.      For compensatory and consequential damages in an amount to be proven at trial, believed to be in excess of $100,000.00;

7.      For pre- and post- judgment interest;

8.      For cost of suit;

9.      For disgorgement of commissions;

As to All Causes of Action:

10.     For interest; and

11.     For such other and further relief as the Court may deem just and proper.

FAX FILING

7

# DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all issues and claims triable as of right by a jury.

DATED: February 21, 2017

LAW OFFICE OF MELINDA C. ROMINES

By: _____
Melinda C. Romines, Esq.
Attorneys for Plaintiff
ALEX GONZALEZ VELAZQUEZ

FAX FILING

11:39:09 2017-03-07

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Melinda C. Romines, Esq. (302958)
Law Office of Melinda C. Romines
3532 Katella Ave., Ste. 214
Los Alamitos, CA 90720
TELEPHONE NO: (714) 924-4829    FAX NO: (714) 333-4821
ATTORNEY FOR *(Name)*: ALEX GONZALEZ VELAZQUEZ

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles 90012
BRANCH NAME: STANLEY MOSK

FOR COURT USE ONLY

FILED
Superior Court of California
County of Los Angeles

MAR 07 2017

Sherri R. Carter, Executive Officer/Clerk
By_____ Deputy
Nancy Alvarez

CASE NAME:
GONZALEZ v. MIH ENTERTAINMENT, LLC., et. al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ✔ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter   ☐ Joinder  Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | BC 653688 |

JUDGE:
DEPT:

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
✔ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
✔ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ✔ is  ☐ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ✔ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. ✔ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ✔ punitive
4. Number of causes of action *(specify)*: THREE
5. This case ☐ is  ✔ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 21, 2017
Melinda C. Romines
_____     ▶     _____
(TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;

11:39:09 2017-03-07

| SHORT TITLE: GONZALEZ v MIH ENTERTAINMENT, LLC., et. al. | CASE NUMBER |
|---|---|

BC 653688

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|
| **Auto Tort** — Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage Wrongful Death Tort** — Asbestos (04) | ☐ A6070  Asbestos Property Damage | 1, 11 |
| | ☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | ☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11 |
| Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | ☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | ☐ A7270  Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | ☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

*FAX FILING*

11:39:09 2017-03-07

| SHORT TITLE: GONZALEZ v MIH ENTERTAINMENT, LLC., et. al. | CASE NUMBER |
|---|---|

| | **A** Civil Case Cover Sheet Category No. | **B** Type of Action (Check only one) | **C** Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

*FAX FILING*

LACIV 109 (Rev 2/16)     **CIVIL CASE COVER SHEET ADDENDUM**     Local Rule 2.3

11:39:09 2017-03-07

| SHORT TITLE: GONZALEZ v MIH ENTERTAINMENT, LLC., et. al. | | CASE NUMBER |
|---|---|---|

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☐ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☑ A6009  Contractual Fraud | 1, 2, 3, ⑤ |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation          Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

*FAX FILING*

LACIV 109 (Rev 2/16)          **CIVIL CASE COVER SHEET ADDENDUM**          Local Rule 2.3

11:39:09 2017-03-07

*Real Property 2 0 1 7*

| SHORT TITLE: GONZALEZ v MIH ENTERTAINMENT, LLC., et. al. | CASE NUMBER |
|---|---|

## Step 4: Statement of Reason and Address:
Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: | ADDRESS: |
|---|---|
| □ 1. □ 2. □ 3. □ 4. ☒ 5. □ 6. □ 7. □ 8. □ 9. □ 10. □ 11. | 909 W. Temple Street, #640 |

| CITY: Los Angeles | STATE: CA | ZIP CODE: 90012 |
|---|---|---|

## Step 5: Certification of Assignment:
I certify that this case is properly filed in the __Central__ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: February 21, 2017

(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

03/10/2017

*FAX FILING*

EXHIBIT

4

exhibitsticker.com

# PURCHASE AGREEMENT

This purchase agreement is dated <u>07/21/2017</u> , and is between MIH ENTERTAINMENT, LLC, a California limited liability company ("**Seller**") with offices at

1812 W. Burbank Blvd Ste 375 Burbank CA 91506
and Otimo Music Inc., a Canadian corporation ("**Purchaser**") with offices at
3246 Cedar Ave. Westmount QC H3Y1Z5

The parties agree as follows:

## 1.    Assignment.

**1.1**    Effective July 21, 2017 ("**Effective Date**") and in consideration of the Purchase Price in section 2, Seller hereby assigns to Purchaser 100% of Seller's interest in the musical composition, sound recording, and master video copyrights, and 100% of the rights to all related royalties attributable to the related Works ("**Assigned Rights**"). "**Works**" are the musical works listed in attachment A.

**1.2**    Seller shall direct its royalty distributors ("**Distributors**"), and any other paying entity to pay the Assigned Rights directly to Purchaser or Purchaser's administrator. Seller shall execute any document required by any paying entity necessary to assign the Assigned Rights.

**1.3**    The term of this assignment is for the full duration of Seller's interest in the copyright of the Works, including any extensions and renewals.

**1.4**    The assignment includes assignments of various agreements between Seller and its Distributors, as well as an agreement between Seller and the artist of the Works. The agreements are attached as Attachment B. Seller's rights and obligations in the attached agreements are hereby incorporated by reference.

**1.5**    The assignment includes the right to receive all income earned from any source with respect to the Assigned Right that has not been received by Seller prior to the Effective Date and a 100% share of all existing or potential causes of action including, without limitation, those for infringement, underpayment or non-payment of the Assigned Rights.

**2.    Purchase Price.** Purchaser agrees to pay Seller U.S. $420,000.00 as the purchase price for the Assigned Rights (the "**Purchase Price**") to be held in escrow until completion of the transaction.

**3.    Seller's Obligations and Statements of Fact.**

**3.1**    Seller is the sole owner of its interest in the Assigned Rights and is the sole owner of the the musical compositions, sound recordings and master videos copyrights which are being assigned under this Agreement. The Assigned Rights are free and clear from all encumbrances and none of the musical compositions, sound recordings and master videos being assigned to the Purchaser under this Agreement infringes the rights of any third party and the assignment under this Agreement does not infringe the rights of any third party. The Seller has has full authority to enter this agreement and perform its obligations, and no person holds a power of attorney on Seller's behalf affecting the assigned interest.

**3.2**    Seller has not and shall not do anything that would impair Purchaser's right to receive the Assigned Rights. Promptly after the Effective Date, Seller shall take all actions necessary to enable Purchaser to notify Seller's Distributors or any other paying entity that the Seller's rights have been assigned to Purchaser.

**3.3**    No valid adverse claim exists with respect to the Assigned Rights or any other rights assigned by Seller. Seller is not bound by any action or agreement that would prevent it from performing its obligations and no current or prior employee of Seller has any actual or potential claim against Seller or the Assigned Rights that would in any way impair the rights being assigned to Purchaser.

**3.4**    All material conditions to the assignment have been satisfied including, without limitation, the obtaining of any approval, the giving of any notice, the making of any filing, and the satisfying of any payments or claims of any third party. No third party has a right of first refusal with respect to the Assigned Rights.

**3.5**    All taxes accrued or owing through the date of execution of this agreement related to the Assigned Rights, including without limitation any sales or transfer taxes resulting from the transaction, if any, have been or will be paid by Seller.

**3.6**    Seller has not and will not enter into any agreement with respect to the Works or the Assigned Rights that would conflict with the terms of this agreement. Seller has not settled any claim nor waived any right and will not settle any claim or waive any right concerning any of the Assigned Rights or the Works that would conflict with the terms of this agreement.

**4.    Purchaser's Statement of Fact and Acknowledgment.** Purchaser states that it has the full authority to enter and perform its obligations under this agreement. Purchaser acknowledges

that Seller's Distributors or other paying entity may need to approve the assignment and may not prorate royalty payments earned before and after the Effective Date. Therefore, Purchaser may not receive payment from the Distributors or other paying entity until the next accounting statement after the Effective Date, and may need to rely on section 6 for any post-Effective Date payments sent to Seller.

**5.     Inspection Period.**Purchaser may, for a period of no more than three business days after the Effective Date, conduct its own inspection related to the information presented in the marketplace listing and the truth and accuracy of Seller's statements of fact. Purchaser shall not withhold approval of the transaction unless it discovers and notifies Seller of a material misrepresentation or deficiency during the inspection period. Seller shall have the opportunity to promptly cure any misrepresentation or deficiency upon notification by Purchaser.

**6.     Income After Assignment.**All royalty payments related to the Assigned Rights paid after July 31, 2017, regardless of when earned or when the performances from which such royalties derive occurred, are the sole property of Purchaser. If any such sums are received by or on behalf of Seller after July 31, 2017, Seller shall transmit or cause the recipient to transmit the amounts immediately upon receipt to Purchaser. All such sums not transmitted within 15 days after receipt shall accrue interest at the rate of 2% per month.

**7.     Indemnity.**Seller shall indemnify Purchaser and Purchaser's administrator against all losses and liabilities, including reasonable attorneys' fees, related to any alleged breach of, or failure by Seller to perform any of Seller's obligations under this agreement, or related to any errors (knowing or unknowingly) in the Seller's Statement of Facts. Purchaser or Purchaser's administrator shall notify Seller of any claim presented to Purchaser or Purchaser's administrator by a third party and Seller shall have the right to participate in the defense of any such claim with counsel of Seller's choosing at Seller's sole cost and expense.

**8.     Additional Documents and Power of Attorney.**Seller shall promptly, at Purchaser's request, execute all documents necessary to transfer the Assigned Rights to Purchaser ("**Transfer Documents**"). If Purchaser requests Seller to execute a Transfer Document, and Seller fails to execute the document within 10 business days after notification, Seller appoints Purchaser, as Seller's true and lawful attorney, to execute all Transfer Documents in Seller's name. Purchaser shall deliver to Seller copies of all Transfer Documents executed by Purchaser in the exercise of the power of attorney. The power of attorney granted to Purchaser is limited and specific to Transfer Documents.

**9.     Fees.**The parties may have separate agreements with Royalty Exchange with respect to all fees payable to Royalty Exchange. The parties acknowledge that any fee charged to the

Seller shall be paid to Royalty Exchange out of the Purchase Price, and any fee charged to the Purchaser shall be paid to Royalty Exchange in addition to the Purchase Price.

**10.     Notices.** Any notice required by this agreement shall be in writing and sent to the address in the introductory clause unless the party has given a new address to the other party.

**11.     Entirety and Amendment.** This agreement constitutes the entire understanding of the parties and no amendment will be valid unless it is in writing and signed by both parties.

**12.     Attorneys' Fees.** If any proceeding is brought for the enforcement of this agreement, or because of a dispute in connection with any of its provisions, the prevailing party is entitled to recover reasonable attorneys' fees and other costs incurred in the proceeding, in addition to any other relief to which it may be entitled.

**13.     Binding Upon Successors.** This agreement is binding upon and inures to the benefit of the successors, assigns, heirs, executors and legal representatives of the parties.

**14.     Expenses.** The parties shall pay all of their own costs and expenses (including legal fees) in performing due diligence and in negotiating and performing their obligations under this agreement.

**15.     Confidentiality.** Except as otherwise required by law, the parties shall not, without the other party's written consent, disclose to any third party any confidential information supplied by the other party in connection with this agreement, except that such confidential information may be disclosed to either party's counsel, accountants and other professionals on a need-to-know basis related to this agreement.

**16.     Representation By Legal Counsel.** The parties acknowledge that they have had the opportunity to retain legal counsel with respect to this agreement and any choice by either party not to be represented is made independently.

The parties are signing this agreement on the date stated in the introductory clause.

MIH ENTERTAINMENT, LLC

*Michael Conner*

By: _____

Michael Conner
Managing Member

OTIMO MUSIC INC.

*Ryan Stotland*

By: _____

Ryan Stotland
Authorized Signatory

**Attachment A**

The Works

| Artist Name | Release Name | Track Name | UPC | ISRC |
|---|---|---|---|---|
| King Lil G | 90's Kid | Graff Intro | 97037051099 | USASN1500301 |
| King Lil G | 90's Kid | Ignorance | 97037051099 | USASN1500302 |
| King Lil G | 90's Kid | Grow Up (feat. Chikk) | 97037051099 | USASN1500303 |
| King Lil G | 90's Kid | Weed 4 the Low (feat. Self Provoked & La Gun Smoke) | 97037051099 | USASN1500304 |
| King Lil G | 90's Kid | That Loud | 97037051099 | USASN1500305 |
| King Lil G | 90's Kid | Get High (feat. Krypto) | 97037051099 | USASN1500306 |
| King Lil G | 90's Kid | No Reason | 97037051099 | USASN1500307 |
| King Lil G | 90's Kid | Same Ones | 97037051099 | USASN1500308 |
| King Lil G | 90's Kid | Eternal West Coast (feat. Chikk) | 97037051099 | USASN1500309 |
| King Lil G | 90's Kid | House Party (Skit) | 97037051099 | USASN1500310 |
| King Lil G | 90's Kid | More Bounce (feat. Young Drummer Boy & 2-Tone) | 97037051099 | USASN1500311 |
| King Lil G | 90's Kid | 9'6 (feat. Emc Senatra) | 97037051099 | USASN1500312 |
| King Lil G | 90's Kid | Gang Signs | 97037051099 | USASN1500313 |
| King Lil G | 90's Kid | Mistakes | 97037051099 | USASN1500314 |
| King Lil G | Ak47boyz | Hopeless Boy (feat. David Ortiz) | 97037101404 | USASN1401183 |
| King Lil G | Ak47boyz | Ak47 | 97037101404 | USASN1401184 |
| King Lil G | Ak47boyz | Can't Relate | 97037101404 | USASN1401185 |
| King Lil G | Ak47boyz | Windows Down (feat. Drummer Boy) | 97037101404 | USASN1401186 |
| King Lil G | Ak47boyz | Delusional | 97037101404 | USASN1401187 |
| King Lil G | Ak47boyz | El Apachino (feat. La Gun Smoke) | 97037101404 | USASN1401188 |
| King Lil G | Ak47boyz | Dirty (feat. Drummer Boy) | 97037101404 | USASN1401189 |
| King Lil G | Ak47boyz | Joey and Jasmine | 97037101404 | USASN1401190 |
| King Lil G | Ak47boyz | Like That (feat. Baby Gunz & Drummer Boy) | 97037101404 | USASN1401191 |
| King Lil G | Ak47boyz | Blunt After Blunt (feat. Reverie) | 97037101404 | USASN1401192 |
| King Lil G | Ak47boyz | Love Kills (feat. Krypto) | 97037101404 | USASN1401193 |
| King Lil G | Ak47boyz | Living My Life (feat. Isuppose, Self Provoked & Carolyn Rodriguez) | 97037101404 | USASN1401194 |
| King Lil G | Ak47boyz | Make You Mine (feat. Carolyn Rodriguez) | 97037101404 | USASN1401195 |
| Lil G | Blue Devil Part 2 | Bangin' on Em (feat. Baby Gunz) | 97037094317 | USASN1200414 |
| Lil G | Blue Devil Part 2 | Black Cortez | 97037094317 | USASN1200415 |
| Lil G | Blue Devil Part 2 | Fallin in Love | 97037094317 | USASN1200416 |
| Lil G | Blue Devil Part 2 | Gunz in My Neighborhood | 97037094317 | USASN1200417 |
| Lil G | Blue Devil Part 2 | Letter to Dr. Dre (feat. Big Swiisha) | 97037094317 | USASN1200418 |
| Lil G | Blue Devil Part 2 | Love La | 97037094317 | USASN1200419 |
| Lil G | Blue Devil Part 2 | Pussy Is a Drug | 97037094317 | USASN1200420 |
| Lil G | Blue Devil Part 2 | Real Life | 97037094317 | USASN1200421 |
| Lil G | Blue Devil Part 2 | Sending This Message | 97037094317 | USASN1200422 |
| Lil G | Blue Devil Part 2 | Sucios Part 2 | 97037094317 | USASN1200423 |
| Lil G | Blue Devil Part 2 | This Is My Life | 97037094317 | USASN1200424 |
| King Lil G | Grow Up - Single | Grow Up | 97037045296 | USASN1500001 |
| King Lil G | King Enemy | I'm Your Enemy (feat. Big Swiisha) | 97037001605 | USASN1201238 |
| King Lil G | King Enemy | Who Shot 2Pac | 97037001605 | USASN1201239 |
| King Lil G | King Enemy | Narco Corridos | 97037001605 | USASN1201240 |
| King Lil G | King Enemy | Out to Get Me (feat. RC & PJ The Gator) | 97037001605 | USASN1201241 |
| King Lil G | King Enemy | Fuck Lil G (feat. Krypto) | 97037001605 | USASN1201242 |
| King Lil G | King Enemy | Talk about Me | 97037001605 | USASN1201243 |
| King Lil G | King Enemy | Roll with a Strap (feat. Big Swiisha) | 97037001605 | USASN1201244 |
| King Lil G | King Enemy | Alkahol | 97037001605 | USASN1201245 |
| King Lil G | King Enemy | Boom Boom Killa (feat. Baby Gunz) | 97037001605 | USASN1201246 |
| King Lil G | King Enemy | If You Don't Know | 97037001605 | USASN1201247 |
| King Lil G | King Enemy | I Don't Give a Fuck | 97037001605 | USASN1201248 |
| King Lil G | King Enemy | Gun Smoke | 97037001605 | USASN1201249 |
| King Lil G | King Enemy | Make Em Clap (feat. 2Tone) | 97037001605 | USASN1201250 |
| King Lil G | King Enemy | Midnite (feat. David Ortiz) | 97037001605 | USASN1201251 |

| King Lil G | King Enemy | Psycho | 97037001605 | USASN1201252 |
| King Lil G | King Enemy | Forget Your Boyfriend | 97037001605 | USASN1201253 |
| King Lil G | King Enemy | Crush on You (feat. Mike Ness) | 97037001605 | USASN1201254 |
| King Lil G | Lost in Smoke | What's Up | 97037070700 | USASN1302106 |
| King Lil G | Lost in Smoke | Killuminati Won't Save You | 97037070700 | USASN1302107 |
| King Lil G | Lost in Smoke | Mob Life | 97037070700 | USASN1302108 |
| King Lil G | Lost in Smoke | Fan Mail | 97037070700 | USASN1302109 |
| King Lil G | Lost in Smoke | That Dro | 97037070700 | USASN1302110 |
| King Lil G | Lost in Smoke | Do You Think of Me | 97037070700 | USASN1302111 |
| King Lil G | Lost in Smoke | El Stilo De Mafia | 97037070700 | USASN1302112 |
| King Lil G | Lost in Smoke | Welcome to La | 97037070700 | USASN1302113 |
| King Lil G | Lost in Smoke | Fuck You Wanna Bee's | 97037070700 | USASN1302114 |
| King Lil G | Lost in Smoke | Liquor Store | 97037070700 | USASN1302115 |
| King Lil G | Lost in Smoke | Fuck 'Em Like I Love 'Em | 97037070700 | USASN1302116 |
| King Lil G | Lost in Smoke | Gods Looking for Me | 97037070700 | USASN1302117 |

**EXHIBIT**

**5**

**SINGH, SINGH & TRAUBEN, LLP**
1    **MICHAEL A. TRAUBEN** (SBN: 277557)
   400 S. Beverly Drive, Suite 240
2    Beverly Hills, California 90212
3    Tel: 310.856.9705; Fax: 888.734.3555
   mtrauben@singhtraubenlaw.com
4

5    *Attorneys for Plaintiff*
   ALEX GONZALEZ VELAZQUEZ p/k/a
6    KING LIL G

CONFORME
OF ORIGINA
Los Angeles Sur

SEP 07 2017

Sherri R. Carter, Executive Officer/clerk

By Shaunya Bolden, Deputy

7          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8          **COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

| | |
|---|---|
| 9   ALEX GONZALEZ VELAZQUEZ p/k/a<br>10   KING LIL G, an individual,<br><br>11        Plaintiff,<br><br>12     v.<br><br>13   MICHAEL W. CONNER, JR., an<br>14   individual, MIH ENTERTAINMENT, LLC,<br>     a California limited liability company, and<br>15   DOES 1-10, inclusive,<br><br>16        Defendants. | ) Case No. BC653688<br>)<br>) **FIRST AMENDED COMPLAINT for:**<br>)<br>)   1. **DECLARATORY RELIEF;**<br>)   2. **DECLARATORY RELIEF;**<br>)   3. **BREACH OF MANAGEMENT**<br>)       **AGREEMENT;**<br>)   4. **BREACH OF FIDUCIARY DUTY;**<br>)   5. **CONVERSION;**<br>)   6. **FRAUD;** *and for an*<br>)   7. **ACCOUNTING**<br>)<br>)<br>) |

17

18       Plaintiff, Alex Gonzalez Velazquez p/k/a King Lil G ("Velazquez" or "Plaintiff"), by

19 and through his undersigned counsel, hereby files his First Amended Complaint ("FAC")

20 against Defendants Michael W. Conner, Jr. ("Conner"), MIH Entertainment, LLC ("MIH") and

21 DOES 1 through 10, inclusive (collectively, "Defendants"), and in support thereof alleges as

22 follows:

23                              **NATURE OF ACTION**

24       1.     This is a case about an unscrupulous entertainment industry manager who

25 grossly abused the trust and confidence a musical artist reposed in him to fabricate an

26 ownership interest in Plaintiff's intellectual property while concurrently commandeering and

27 misappropriating hundreds of thousands of dollars of Plaintiff's monies derived from the

28 distribution, sale and exploitation of Plaintiff's musical works.

Singh,
Singh &
Trauben,
LLP

1

2. Through this Fist Amended Complaint, Plaintiff seeks to recover damages arising from Defendants' unilateral, willful and unjustified material breaches of a personal management agreement with Plaintiff, including Defendants' breaches of fiduciary duties owed to Plaintiff in addition to Defendants' conversion of hundreds of thousands of dollars of Plaintiff's monies.

3. Further, this is an action for declaratory relief, seeking a Court determination as to the termination of any agreements or purported agreements between Plaintiff and Defendants.

## **THE PARTIES**

4. Plaintiff Velazquez is an individual residing in Los Angeles County, California.

5. Upon information and belief, Defendant Conner is an individual residing in Los Angeles County, California.

6. Upon information and belief, Defendant MIH is a limited liability company organized and existing under the laws of the State of California with its principal place of business in Los Angeles County, California.

7. Upon information and belief, Conner holds himself out as the chief executive officer of MIH, and owns, operates and wholly controls MIH.

8. In addition, Plaintiff is informed and believes, and on that basis alleges, that Conner is the "alter ego" of MIH and that there exists, and at all times mentioned herein existed, a unity of interest and ownership between Conner and MIH such that any individuality and separateness between the Defendants has ceased, and Conner controls the business and activities of MIH.

9. Plaintiff is informed and believes, and on that basis alleges, that at all times herein mentioned, MIH was and is a mere shell, instrumentality and conduit through which Conner carried on his business in the corporate name, exactly as he would have had there been no corporation at all, exercising complete control and dominance over such business to the point where any individuality or separateness between Conner and MIH does not, and at all times herein mentioned, did not, exist.

Singh, Singh & Trauben, LLP

2

10. In addition, upon information and belief, Conner further comingled and continues to comingle his assets with MIH, controlled and continues to control MIH's finances in their entirety, treated and treats MIH's assets as his own, and further engaged and engages in such zealous controlling conduct towards MIH that MIH was and remains nothing more than a mere instrumentality of Conner.

11. Upon information and belief, MIH is and was extremely undercapitalized as all, or most, of the revenues and monies yielded from MIH's business were and have been drained from MIH and transferred to Conner and, further, Conner has and continues to use the assets of MIH for his own personal use and has wrongfully diverted from their intended use significant sums of money properly to be paid by MIH to Plaintiff.

12. Plaintiff is informed and believes, and on that basis alleges, that MIH is unable to satisfy any judgment against it.

13. Adherence to the fiction of the separate existence of Conner as an individual separate and distinct from MIH would permit an abuse of the corporate privilege and would sanction fraud or promote injustice in that Conner might escape liability for the causes of action set out herein and would permit an abuse of the corporate privilege and produce an inequitable result.

14. The true names and capacities, whether individual, corporate, partnership, associate, or otherwise, of the Defendants named herein as DOES 1 through 10, inclusive, are presently unknown to Plaintiff, who therefore sues these Defendants by fictitious names. Plaintiff will seek leave of Court to amend this pleading to allege their true names and capacities as soon as they are ascertained. Plaintiff further alleges, upon information and belief, that each of these fictitiously named Defendants is responsible in some manner for the acts alleged herein.

## **JURISDICTION AND VENUE**

15. The harms and obligations sued upon were incurred and occurred in the County of Los Angeles.

16.     Jurisdiction is premised on the fact that the damages suffered by Plaintiff are in excess of the minimum sum required for jurisdiction in the Superior Court of the State of California.

17.     Further, this Court has personal jurisdiction over Defendants on the grounds that Defendants reside in this State and Defendants conduct and transact substantial business activities in this State and contract to supply services in this State, and Defendants have purposefully availed themselves of the jurisdiction of this Court by transacting substantial business in this State.

18.     Venue and jurisdiction are proper in this State and County as all or substantially all of the subject transactions have occurred in this State and County.

19.     In addition, venue is also proper in Los Angeles County, California as, pursuant to the subject written management agreement executed by Plaintiff and Defendant MIH, the parties expressly agreed to submit to the jurisdiction of the courts of the State of California with respect to any controversies regarding the personal management agreement.

## **FACTUAL BACKGROUND**

20.     Plaintiff is a well-established hip-hop artist professionally known as "King Lil G".

21.     Plaintiff first met Defendant Conner in or around June 2012 when Defendant Conner appeared at one of Plaintiff's music video shoots in furtherance of attempting to work with the then creator and director of Plaintiff's music videos.

22.     Upon information and belief, at the time Plaintiff met Defendant Conner in or around June 2012, Defendant Conner was 21 years old.

23.     During this initial meeting, Conner represented to Plaintiff that Conner's father allegedly worked as an A&R consultant for the record label Bad Boy Entertainment, and that Conner was similarly attempting to work in the music business.

24.     Soon thereafter, starting in or around June 2012, Conner commenced working as the personal assistant to Plaintiff, performing such tasks as scheduling meetings for Plaintiff,

coordinating the scheduling of interviews with publications seeking to interview Plaintiff, picking up food and drinks for participants in Plaintiff's music video shoots, and assisting Plaintiff with the uploading of Plaintiff's music on various digital music streaming services such as Spotify or Pandora Internet Radio.

25.    To Plaintiff's knowledge, around this time period, Conner was not working with or representing any other artists or producers in the music industry.

26.    Upon information and belief, around this time, Defendant MIH did not yet exist, being first established on or around August 28, 2012.

27.    After providing intermittent assistant to Plaintiff in the capacity of a personal assistant for approximately six (6) months, Conner requested that Plaintiff agree to afford Conner the opportunity to serve as Plaintiff's personal manager in the entertainment industry.

28.    Based upon Conner having gained the trust and confidence of Plaintiff during the prior six (6) months of serving as Plaintiff's personal assistant, Plaintiff agreed to afford Conner the opportunity to perform services for Plaintiff in the capacity of a personal manager.

**The Management Agreement**

29.    On or around January 1, 2013, and consistent with the parties' decision in this regard, Plaintiff and Defendant MIH entered into a written artist management agreement (the "Management Agreement"). A true and correct copy of the Management Agreement is attached hereto as Exhibit "A".

30.    Pursuant to the Management Agreement, in exchange for the right to receive a sum of money equal to ten percent (10%) of Plaintiff's gross monthly earnings related to Plaintiff's career in the entertainment and music industry, Defendant MIH agreed and was obligated to provide and perform those services normally and customarily provided by personal managers in the music and entertainment industry, including the provision of such advice, guidance, counsel and other services as Plaintiff reasonably required to further Plaintiff's career in the entertainment industry.

31.    In addition, Defendant MIH explicitly agreed pursuant to the Management

Singh,
Singh &
Trauben,
LLP

5

Agreement to maintain accurate books and records of all transactions concerning Plaintiff, which books and records could be inspected during regular business hours by a certified public accountant designed by Plaintiff and upon reasonable notice to Defendant MIH.

32.     The Management Agreement further explicitly provided that the initial term of the Management Agreement expired on January 1, 2014.

33.     To extend the initial term of the Management Agreement, Defendant MIH was required, pursuant to paragraph 7 of the Management Agreement, to send a written notice to Plaintiff "no less than SIXTY (60) days prior to the expiration of the initial term", specifically, January 1, 2014.

34.     Prior to the expiration of the initial term on January 1, 2014, the parties understood and agreed that Defendant MIH would no longer serve as Plaintiff's personal manager in the entertainment industry, and that the parties would let the Management Agreement expire by its own terms on January 1, 2014.

35.     Based upon this understanding, Defendant MIH did not send any written notice to Plaintiff prior to the expiration of the initial term seeking to exercise MIH's option to extend the Management Agreement's term beyond January 1, 2014.

36.     Consequently, the parties' Management Agreement terminated, by its own accord, on January 1, 2014.

37.     Following the expiration of the term of the Management Agreement, Defendant Conner reverted to providing intermittent services as a personal assistant to Plaintiff, sporadically attending Plaintiff's music video shoots and recording sessions at Plaintiff's house, while purporting to continue to "help" Plaintiff upload his music to various digital streaming services and interfacing with publications seeking to conduct interviews with Plaintiff.

38.     While, to Plaintiff's knowledge, Defendants' involvement in Plaintiff's day-to-day entertainment activities diminished following the termination of the Management Agreement, Plaintiff agreed that he would give Defendant MIH ten percent (10%) of the advance Plaintiff received in connection with a future record company agreement.

Singh,
Singh &
Trauben,
LLP

39.     In this regard, on or around May 16, 2015, Plaintiff entered into an exclusive recording artist and publishing agreement with Del Records, Inc., pursuant to which Plaintiff was paid $20,000.00 in partial satisfaction of an agreed upon unrecoupable advance.

40.     In turn, Plaintiff paid Defendant Conner ten percent (10%) of the monies Plaintiff received in connection with this partial payment of the advance.

41.     Ultimately, in or around 2016, when Plaintiff's already substantial preexisting following and fan base continued to expand, Plaintiff started to question Defendants regarding the existence and amount of revenues being derived from the sale, distribution and exploitation of Plaintiff's musical works on various digital streaming services, including YouTube, Spotify and Pandora Internet Radio, for which Plaintiff had not received any revenues.

42.     In response, while Defendants would acknowledge that there was no written agreement between Defendants and Plaintiff that would allow Defendants to exploit Plaintiff's musical works, and certainly no written agreements that would permit Defendant to own or control Plaintiff's YouTube channel, Defendants would also paradoxically claim that Defendants were trying to help maximize Plaintiff's "cost-per-view" ("CPV") for video ads preceding the display of Plaintiff's musical works.

43.     However, when Plaintiff would request accounting statements and related documents reflecting the amount of monies Defendants had collected, including during the term of the Management Agreement, Defendants would evade the question and revert to referencing a nebulous "mutual understanding" of what Defendants "do for" Plaintiff.

44.     When Plaintiff would attempt to converge on specifics, while further demanding a full accounting, Defendant Conner would claim that he was working with his "attorney" to ensure that Plaintiff's channel was returned to his control. Defendants did not, however, provide any semblance of an accounting as required under the Management Agreement.

45.     Contemporaneously, in direct contravention of the termination of the Management Agreement, Plaintiff also discovered that Defendants were still holding themselves out as Plaintiff's "manager" in the entertainment industry, despite Defendants'

Singh,
Singh &
Trauben,
LLP

firsthand knowledge of Plaintiff's retention of another entity as his personal manager.

46.     Accordingly, on or around December 16, 2016, based upon Defendants' ongoing failure and refusal to provide Plaintiff with an accounting of royalties Defendants had admitted to collecting and retaining, Plaintiff sent Defendants a formal written notice requesting an accounting of all royalties.

47.     Thereafter, on February 17, 2017, after Defendants had continued to fail and refuse to furnish the requisite financial documentation, Plaintiff caused a cease and desist letter to be sent to Defendants, reiterating Defendants' wholesale failure to properly account to Plaintiff for the monies belonging to Plaintiff that Defendants continued to commandeer, and further demanding that Defendants cease and desist from representing that Defendants were acting as the manager of Plaintiff or in any manner affiliated with Plaintiff.

### Defendants' Fraudulent "Recording" Agreement

48.     Unbeknownst to Plaintiff, at some unknown point in time during the course of the parties' dealings, Defendants obtained a generic copy of a template for an artist and record company agreement and falsified the signature of Plaintiff (the "Recording Agreement"). A true and correct copy of the Recording Agreement is attached hereto as Exhibit "B".

49.     The falsified Recording Agreement is purportedly dated January 7, 2013, just six (6) days after the parties executed the Management Agreement. There is no reference to the Management Agreement within the falsified Recording Agreement.

50.     The template Recording Agreement contractually required Defendant MIH to advance all recording costs for Plaintiff, and account to Plaintiff in connection with all royalties collected by Defendant MIH on behalf of Plaintiff.

51.      Specifically, according to the falsified Recording Agreement, Defendant MIH agreed to pay for the production and release of a long-playing album formatted master recording comprised of no less than twelve (12) master recordings for a total of twelve (12) recorded songs, embodying compositions not yet recorded by Plaintiff.

52.     In addition, according to the falsified Recording Agreement, Defendant MIH was

required to generate royalty statements delineating all royalties otherwise owed to Plaintiff on a semi-annual basis, and to pay Plaintiff all accrued royalties earned during these periods.

53.    Further confirming the fraudulent falsification of this purported Recording Agreement, Defendants never, at any time, advanced any of their own monies towards the production and release of Plaintiff's musical works and never provided Plaintiff with any royalty statements as otherwise required under the Recording Agreement.

54.    Nonetheless, without Plaintiff's knowledge or consent, Defendants summoned the falsified purported exclusive Recording Agreement to convince various third parties that Defendant MIH owned and controlled Plaintiff's compositions and master recordings, often inducing various third parties to collect revenues derived from the exploitation of Plaintiff's musical works and to distribute such revenue directly to Defendants.

55.    At all times, Defendants intentionally failed to disclose to Plaintiff that Defendants were drawing upon a fraudulent and falsified generic Recording Agreement to induce third parties to collect and distribute revenues to Defendants derived from the digital exploitation of Plaintiff's musical works.

56.    Through the course of this fraudulent scheme, Defendants have collected hundreds of thousands of dollars belonging to Plaintiff.

57.    In one instance, in or around October 2016, Defendants induced Live Nation Entertainment, Inc. ("Live Nation") to promote and exploit Plaintiff's YouTube channel that Plaintiff created on or around November 27, 2009, which channel maintains at least 422,945 subscribers and 184,123,298 views.

58.    After Plaintiff learned that he was not in control of his own YouTube channel, Plaintiff contacted YouTube which disclosed that Live Nation was collecting the entirety of all revenues being generated from the monetization of Plaintiff's musical recordings and music videos as displayed on YouTube.

59.    It was only after contacting Live Nation in or around August 2017 that Plaintiff was able to obtain a copy of the falsified Recording Agreement, which represented the first time

FIRST AMENDED COMPLAINT

Singh,
Singh &
Trauben,
LLP

Plaintiff discovered the existence of this generic falsified Recording Agreement.

60.     Currently, based upon the falsified Recording Agreement, absent a judicial determination, Live Nation will not agree to return control of Plaintiff's YouTube account and the corresponding collection of revenue generated from Plaintiff's YouTube account to Plaintiff.

61.     In addition, in or around July 2017, months after the filing of this action, Defendants further summoned the falsified Recording Agreement to fraudulently induce another third party to allegedly "purchase" the falsified Recording Agreement and its alleged corresponding assets (i.e. Plaintiff's musical works") from Defendants for the sum of $420,000.00.

62.     All conditions precedent to the institution of this action have been satisfied, discharged, excused, and/or waived.

## COUNT I
## DECLARATORY RELIEF

63.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

64.     The Management Agreement expired by its own terms on January 1, 2014.

65.     Notwithstanding that Defendants have collected and retained sums of money far in excess of what would otherwise be due and owing to Defendants under the Management Agreement, and despite Defendants having concurrently unlawfully commandeered hundreds of thousands of dollars of Plaintiff's monies stemming from the exploitation of Plaintiff's musical works, Defendants continue to claim Defendants are entitled to additional compensation under the Management Agreement.

66.     There is a present actual and justiciable controversy between the parties, whereunder the parties are in doubt about their respective rights and obligations under the Management Agreement, including with respect to Defendants' ongoing contention that Defendants are entitled to additional payments.

67.     Accordingly, Plaintiff seeks a declaratory judgment of this Court declaring that

Plaintiff does not owe Defendants any monies, obligations, duties or compensation of any kind or nature related to the Management Agreement or otherwise, and that the Management Agreement is terminated and of no further force or effect.

## COUNT II
## DECLARATORY RELIEF

68. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

69. Despite never executing the falsified Recording Agreement, Defendants continue to present the falsified Recording Agreement to various third-parties as a legitimate agreement, fraudulently inducing such third-parties to exploit Plaintiff's musical works and share the proceeds exclusively with Defendants (even if this falsified document was authentic, which it is not, Defendants would have materially breached virtually every material obligation required to be performed under the falsified agreement).

70. There is a present actual and justiciable controversy between the parties, whereunder the parties and various third-parties are in doubt about ownership rights in and to certain musical compositions and master recordings created by and featuring the performance of Plaintiff, including with respect to the authenticity of the falsified Recording Agreement.

71. Accordingly, Plaintiff seeks a declaratory judgment of this Court declaring that the falsified Recording Agreement is invalid and null and void, and that Defendants never, at any time, maintained the right to exploit, sell or assign the musical compositions and master recordings owned and controlled by Plaintiff and featuring the performance of Plaintiff, and that all such musical works are exclusively owned by Plaintiff.

## COUNT III
## BREACH OF MANAGEMENT AGREEMENT

72. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

73. On or around January 1, 2013, Plaintiff and Defendant MIH entered into the Management Agreement.

74. During the course of the Management Agreement, Defendants failed and/or

Singh,
Singh &
Trauben,
LLP

refused to perform or provide the agreed upon and required services in accordance with the Management Agreement, failing and/or refusing to, among other things, properly advise and counsel Plaintiff on matters pertaining to publicity, public relations and advertising for Plaintiff, and with regard to general practices in the entertainment, music and recording industries, and failing and/or refusing to act as the official liaison for Plaintiff, coordinate Plaintiff's recording sessions and professional activities and generally promote and enhance Plaintiff's professional reputation and standing in the music industry.

75.     In addition, Defendants failed and/or refused to transfer and pay Plaintiff his percentage of all monies collected on behalf of Plaintiff pursuant to the parties' Management Agreement.

76.     To facilitate Defendants' improper retention of Plaintiff's funds, Defendants materially breached the Management Agreement by failing to account to Plaintiff for all income, revenues and profits derived from the exploitation of Plaintiff's musical works, and Defendants continue to fail and/or refuse to provide any such accounting to Plaintiff.

77.     Plaintiff has fully performed all of his obligations under the Management Agreement.

78.     As a direct and proximate result of Defendants' material breaches of the parties' Management Agreement, Plaintiff has suffered significant damages and financial injury.

**COUNT IV**
**BREACH OF FIDUCIARY DUTY**
**(As against All Defendants)**

79.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

80.     Inherent in and arising from Defendants' limited representation of Plaintiff and collection of Plaintiff's gross earnings are the fiduciary duties of loyalty, integrity, candor and good faith.

81.     Defendants, by virtue of their relationship with Plaintiff, held influence with Plaintiff and abused such influence. Plaintiff reposed confidence, trust and access to funds with

Singh,
Singh &
Trauben,
LLP

Defendants, who betrayed such confidence and unlawfully commandeered the funds rightfully belonging to Plaintiff stemming from the sale and exploitation of Plaintiff's musical works.

82. Defendants breached their fiduciary duties owed to Plaintiff in the following ways: (i) Defendants engaged in the conduct set forth in this FAC; (ii) Defendants falsified the Recording Agreement to facilitate Defendants' exploitation of Plaintiff's musical works; (iii) Defendants failed and continue to fail to disclose to Plaintiff the amounts Defendants have collected on behalf of Plaintiff (both authorized and unauthorized); (iv) Defendants unlawfully retained 100% of all monies due and owing to Plaintiff stemming from the sale and distribution of Plaintiff's musical works; (v) Defendants failed to provide Plaintiff with accounting statements; (vi) Defendants placed their financial and personal interests above Plaintiff's interests; and (vii) Defendants continue to collect monies on behalf of Plaintiff without authorization.

83. Defendants' actions were performed solely for their own benefit and financial interests, and to the direct detriment of the interests of Plaintiff.

84. As a direct and proximate result of Defendants' breaches of their fiduciary duties owed to Plaintiff, Plaintiff has suffered significant damages and financial injury.

85. Defendants' breaches of fiduciary duty were committed with oppression, fraud, and malice within the meaning of *Civil Code* section 3294. As a result, Plaintiff is entitled to recover exemplary damages pursuant to *Civil Code* section 3294.

## COUNT V
## CONVERSION
### (As against All Defendants)

86. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

87. Plaintiff owned and had a right to possess the musical compositions and master recordings he developed, funded and created.

88. Defendants Conner and MIH intentionally and substantially interfered with Plaintiff's property by purporting to take possession of and own the rights in and to Plaintiff's

musical compositions and master recordings.

89.     Plaintiff never, at any time, consented to Defendants Conner and MIH's purported possession and ownership in Plaintiff's musical compositions and master recordings.

90.     Plaintiff has suffered significant harm and financial damages as a direct and proximate result of Defendants' wrongful exercise of control of Plaintiff's property.

91.     Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## COUNT VI
## FRAUD
## (As against All Defendants)

92.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 62 as if fully set forth herein.

93.     Without Plaintiff's knowledge or consent, Defendants fabricated and backdated a falsified Recording Agreement wherein Defendants claimed to maintain an ownership interest in Plaintiff's musical works.

94.     Further without Plaintiff's knowledge or consent, Defendants proceeded to hold themselves out as Plaintiff's recording company, inducing various third-parties to facilitate the sale and exploitation of musical works Plaintiff created and owned, while channeling the revenues derived from such exploitation directly to Defendants.

95.     Defendants, at all times relevant, failed to notify Plaintiff of Defendants' collection and retention of significant royalties and revenues derived from the exploitation of Plaintiff's musical works, including that Defendants were proactively inducing third parties to collect and pay Defendants substantial revenues stemming from the exploitation of Plaintiff's music.

96.     While the full nature and extent of Defendants' improper use of the falsified Recording Agreement is currently unknown, Plaintiff is aware that Defendants induced Live Nation to promote and exploit Plaintiff's YouTube channel, which channel, created by Plaintiff on or around November 27, 2009, maintains at least 422,945 subscribers and 184,123,298 views.

Singh,
Singh &
Trauben,
LLP

97. After learning that Plaintiff was no longer in control of his own YouTube channel, Plaintiff contacted YouTube which disclosed that Live Nation was collecting the entirety of all revenues generated from the monetization of Plaintiff's musical recordings and music videos displayed on YouTube.

98. As a direct and proximate result of Defendants' fraudulent conduct, Plaintiff has suffered severe financial damages.

99. Plaintiff has been damaged in an amount to be determined at trial.

## COUNT VII
## ACCOUNTING
### (As against all Defendants)

100. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 99 as if fully set forth herein.

101. Pursuant to the Management Agreement, Defendants directly collected all revenues generated by and through Plaintiff's musical works in the entertainment industry.

102. Separately, and without Plaintiff's knowledge and consent, and continuing after the termination of the Management Agreement, Defendants summoned the falsified Recording Agreement to collect additional monies generated by the sale, distribution and exploitation of Plaintiff's musical works in the entertainment industry.

103. To date, Defendants have improperly retained all such revenues derived from the exploitation of Plaintiff's musical works, including revenues substantially exceeding any sums Defendant MIH would otherwise be owed under the Management Agreement.

104. Defendants have further failed and refused to account to Plaintiff as to all such funds Defendants have received through the exploitation of Plaintiff's musical works.

105. As the Management Agreement involves, among other things, a duty to account for all gross earnings derived from the exploitation of Plaintiff's musical works, and Defendants continues to fail and/or refuse to provide any such accountings to Plaintiff, it is not clear that the remedy at law would be as full, adequate, and expeditious as it is in equity.

106. The amount of money due from Defendants to Plaintiff is unknown to Plaintiff

Singh,
Singh &
Trauben,
LLP

1  and cannot be ascertained absent a full and complete accounting of the royalty statements and

2  business receipts.

3      107.    Plaintiff has demanded an accounting of the aforementioned financial and

4  royalty statement and receipts from Defendants, and payment of all amounts due and owing to

5  Plaintiff, however, Defendants have failed and refused, and continue to fail and refuse, to render

6  such an account and pay such sums.

7      108.    Accordingly, Plaintiff is in need of and requests a full and complete accounting

8  of all gross earnings and receipts, including any and all income, compensation, consideration

9  and/or other monies Defendants have collected in connection with the sale, distribution and

10  exploitation of Plaintiff's musical works, and for such other relief as the Court may deem just

11  and proper.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Alex Gonzalez Velazquez p/k/a King Lil G respectfully

requests that this Court enter a final judgment in his favor and as against Defendants Michael

W. Conner, Jr. and MIH Entertainment, LLC, jointly and severally, and prays for relief as

follows:

On All Causes of Action:

    i.      That Defendants are jointly and severally liable;

    ii.     For not less than $1,000,000.00;

    iii.    For all actual, general, special, economic, and compensatory damages according to proof at trial;

    iv.    That the Court declare that the parties' Management Agreement dated January 7, 2013 is terminated in its entirety and that no Plaintiff does not owe Defendants any monies or other compensation in connection with the Management Agreement;

    v.     That the Court declare that the falsified Recording Agreement dated January 7, 2013 is null and void;

vi.     That Defendants be ordered to furnish to Plaintiff a complete and accurate accounting of all gross receipts and revenues, including any and all income, compensation, consideration and/or other monies, Defendants received or collected, directly or indirectly, in connection with the sale, distribution or exploitation of any musical works created, in whole or in part, by Plaintiff;

vii.    That the Court impose a constructive trust over all property and monies belonging to Plaintiff that Defendants misappropriated and converted, and that the Court require an accounting from Defendants of all revenues and monies earned as a direct or indirect consequence of the property subject to the constructive trust;

viii.   Expectation and consequential damages;

ix.    For pre-judgment interest on all damages, at the legal rate;

x.     For all attorneys' fees and costs of suit incurred herein;

xi.    For an award of punitive and exemplary damages in an amount commensurate with the egregious nature of Defendants' willful, malicious and oppressive actions, and significant enough to dissuade Defendants from pursuing similar conduct in the future; *and*

xii.    That the Court grants such other and further relief as this Court deems just, proper, and equitable under the circumstances.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury on all issues in this action.

1    DATED: September 7, 2017          Respectfully submitted,

2

3                                       **SINGH, SINGH & TRAUBEN, LLP**
                                      **MICHAEL A. TRAUBEN**

4

5                                       By: _____

6                                          Michael A. Trauben

7                                       *Attorneys for Plaintiff*
                                      ALEX GONZALEZ VELAZQUEZ p/k/a

8                                       KING LIL G

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT "A"

# ARTIST MANAGEMENT AGREEMENT

This **AGREEMENT** is made this 1st day of January, 2013 by and between Alex Gonzalez Velazquez p/k/a King Lil G (hereinafter referred to as "Artist") and MIH Entertainment, LLC, a California limited liability company (hereinafter referred to as "Manager").

## WITNESSETH

**WHEREAS,** Artist wishes to obtain advice, guidance, counsel, and direction in the development and furtherance of his career as a musician, recording, and performing artist and in such new and different areas as his artistic talents can be developed and exploited; and

**WHEREAS,** Manager by reason of Manager's contacts, experience and background, is qualified to render such advice, guidance, counsel, and direction to Artist;

**NOW THEREFORE,** in consideration of the mutual promises herein contained, it is agreed and understood as follows:

1.       Manager agrees to render such advice, guidance, counsel, and other services as Artist may reasonably require to further his career as a musician, composer, actor, recording, and performing artist, and to develop new and different areas within which his artistic talents can be developed and exploited,  including but not limited to the following services:

    (a)       to represent Artist and act as his negotiator, to fix the terms governing all manner of disposition, use, employment or exploitation of Artist's talents and the products thereof;

    (b)       to supervise Artist's professional employment, and on Artist's behalf, to consult with employers and prospective employers so as to assure the proper use and continued demand for Artist's services;

    (c)       to be available at reasonable times and places to confer with Artist in connection with all matters concerning Artist's professional career, business interests, employment, and publicity;

    (d)       to exploit Artist's personality in all media, and in connection therewith, to approve and permit for the purpose of trade, advertising and publicity, the use, dissemination, reproduction or publication of Artist's name, photographic likeness, facsimile signature, voice and artistic and musical materials;

    (e)       to engage, discharge and/or direct such theatrical agents, booking agencies and employment agencies, as well as other firms, persons or corporations who may be retained for the purpose of securing contacts, engagements or employment for Artist; and

    (f)       to represent Artist in all dealings with any union.

1

2.     Manager is not required to render exclusive services to Artist or to devote his entire time or the entire time of any of Manager's employees to Artist's affairs. Nothing herein shall be construed as limiting Manager's right to represent other persons whose talents may be similar to or who may be in competition with Artist or to have and pursue business interests which may be similar to or may compete with those of Artist.

3.     Artist hereby appoints Manager as his sole personal manager in all matters usually and normally within the jurisdiction and authority of personal manager, including but not limited to the advice, guidance, counsel, and direction specifically referred to in Paragraph 1 hereof. Artist agrees to seek such advice, guidance, counsel, and direction from Manager exclusively and agrees that he will not engage any other agent, representative, or  manager to  render similar services, and that he will not perform said services on his own behalf and he will not negotiate, accept, or execute any agreement, understanding, or undertaking concerning his career as an actor, musician, recording and performing artist without Manager's prior consent.

4.     (a)     As compensation for the services to be rendered hereunder, Manager shall receive from Artist (or shall retain from Artist's gross monthly earnings) at the end of each calendar month during the term hereof a sum of money equal to **TEN PERCENT (10%)** of Artist's gross monthly earnings and Artist hereby assigns to Manager an interest in such earnings to the extent of said percentage.

       (b)     The term "monthly gross earnings", as used herein, refers to the total of all earnings, which shall not be accumulated or averaged whether in the form of salary, bonuses, royalties, interest percentages, shares of profits, merchandise, shares in ventures, products, properties, or any other kind or type of income which is reasonably related to Artist's career in the entertainment, amusement, music, recording, motion picture, television, radio, literary, theatrical, and advertising fields, and Artist's artistic talents are developed and exploited, received from administrators, assigns, or by any person, firm, or corporation (including Manager) on his behalf.

             (i)     Royalty advances made to Artist which are deemed recoupable against future earnings by the party or parties making such royalty advances shall not be included in gross monthly income.

             (ii)     Royalty payments made to Artist after recoupment shall be payable to Manager at the scale and rate aforementioned in Section 4 of this Agreement.

       (c)     The compensation agreed to be paid to Manager shall be based upon gross monthly earnings (as defined herein) of Artist accruing to or received by Artist during the term of this Agreement or subsequent to the termination of this agreement as a result of any services performed by Artist during the term hereof or as the result of any contract negotiated during the term hereof and any renewal, extension, or modification of this Agreement.

       (d)     In the event that Artist forms a corporation during the term hereof  for that purpose of furnishing and exploiting his artistic talents, Artist agrees that said corporation shall

2

offer to enter into a management contract with Manager identical in all respects to this Agreement (except as to the parties thereto).

(i)     In the event that Manager accepts such offers, then the gross monthly earnings of such corporation prior to the deduction of any corporate income taxes and of any corporate expenses or other deductions shall be included as a part of the Artist's gross monthly earnings as herein defined, and any salary paid to Artist by such corporation shall be excluded from Artist's gross monthly earnings for the purpose of calculating the compensation due to Manager hereunder.

(e)     In the event that Artist forms a corporation or enters into a contract with a corporation during the term hereof for the purpose of exploiting or furnishing his artistic talents, then in addition to any and all other considerations to be paid to Manager hereunder, Manager shall be entitled to purchase at least **TWENTY PERCENT (20%)** of the capital stock of such corporation at the price of **ONE DOLLAR ($1.00) PER SHARE.** Artist agrees expressly not to enter into any contract with a corporation for such purpose unless said option is made available to Manager.

(f)     Artist agrees that all gross monthly earnings as herein defined may be paid directly to Manager by all persons, firms, or corporations and may not be paid by such persons, firms, or corporations to Artist, and that Manager may withhold Manager's compensation therefrom and may reimburse himself herefrom for any reasonable and receipted fees, costs, or expenses advanced or incurred by Manager that portion of Artist's gross monthly earnings which equals Manager's compensation hereunder and such disbursements incurred by Manager on behalf of Artist.

5.     Artist shall be solely responsible for payment of all booking agencies, fees, union dues, publicity costs, promotional or exploitation costs, traveling expenses and/or wardrobe expenses and reasonable expenses arising from the performance by Manager of services hereunder. In the event that Manager advances any of the foregoing fees, costs, or expenses on behalf of Artist, or incurs any other reasonable expenses in connection with Artist's professional career or with the performance of Manager's services hereunder, Artist shall promptly reimburse Manager for such fees, costs, and expenses.

6.     Artist warrants that he is under no disability, restriction, or prohibition with respect to his right to execute this Agreement and perform its terms and conditions. Artist further warrants and represents that no act or omission by Artist hereunder will violate any right or liability to any person. Artist agrees to indemnify Manager and hold Manager harmless against any damages, costs, expenses, fees (including attorney's fees) incurred by Manager in any claim, suit, litigation, or proceeding instituted against Manager and arising out of any breach or claimed breach by Artist of any warranty, representation, or covenant of Artist. Artist agrees to exert his best reasonable efforts to further his promotional career during the term of this Agreement, and to cooperate with Manager to the fullest extent in the interest of promoting Artist's career.

7.     The initial term of this Agreement shall be for a period of ONE (1) YEAR with a FOUR (4) YEAR annual irrevocable option from the date thereof to renew this Agreement by written

3

notice mailed to Artist no less than SIXTY (60) days prior to the expiration of the initial term or option periods, as the case may be.

8.    Manager agrees to maintain accurate books and records of all transactions concerning Artist, which books and records may be inspected during regular business hours by a certified public accountant designated by Artist upon reasonable notice to Manager.

9.    During the term of this Agreement, it is understood and agreed that there shall be no change or modification of this Agreement unless reduced to writing and signed by all parties hereto. No waiver or any breach of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach hereof.

10.    It is agreed that as a condition precedent to any assertion by Artist or Manager that the other is in default in performing any obligation contained herein, the party alleging the default must advise the other in writing by Certified United States Mail of the specific obligation which it claims has been breached and said other party shall be allowed a period of SIXTY (60) days from the receipt of such written notice within which to cure such default.

11.    This Agreement does not and shall not be construed to create a partnership or joint venture between the parties hereto.

12.    This Agreement shall be construed in accordance with the laws of the State of California governing contracts executed and performed therein, and shall be binding upon and inure to the benefit of the parties, respective heirs, executors, administrators, successors, and assigns.

    **IN WITNESS WHEREOF**, the parties hereunder have subscribed their signatures in the day and year first above written.

**MANAGER:**

MIH ENTERTAINMENT, LLC, a California limited
liability company

By: _____
    Michael Conner, Senior VP of A&R

**ARTIST:**

_____
Alex Gonzalez Velazquez, an individual

4

EXHIBIT "B"

# ARTIST AND RECORD COMPANY MULTIPLE RIGHTS AGREEMENT

The following shall constitute an agreement ("Agreement") dated the 7th day of January 2013 between MIH Entertainment, LLC ("Company") and Alex Gonzalez Velazquez p/k/a King Lil G ("Artist") with respect to Artist exclusively rendering Artist's entertainment services ("Entertainment Services") for Company, during the term ("Term") of this Agreement.

1. **ENGAGEMENT**: Company hereby engages Artist to render such exclusive Artist and Artist hereby accepts such engagement and agrees to render such services exclusively in the Territory, to Company during the Term of this Agreement.

2. **TERM AND OPTIONS**: The term of this Agreement shall commence as of the date hereof and shall continue for twelve months (12) months ("Initial Period"). Artist hereby irrevocably grants to Company the option to extend this Agreement upon the same terms and conditions of the Initial Period for two (2) further consecutive renewal periods of twelve (12) months ("Option Period") (the Initial Period or Option Period may be referred to generally as a "Contract Period"). Each Option Period shall be exercised automatically, unless Company gives written notice to Artist within thirty (30) days prior to the date that the Contract Period would otherwise expire, that Company does not intend on exercising its right to extend this Agreement under the respective Option Company agrees to release in the United States ("Domestic Territory") an LP Album recorded by Artist hereunder for sale ("Release") during a respective Contract Period ("Release Deadline"). Company will release Audio Products for sale in both a Digital Format and physical format (i.e., compact discs). Release in either format shall constitute a Release for purposes of this paragraph. If Company fails to Release any such Album in the Domestic Territory as set forth herein, Company is precluded from exercising its rights under this Agreement for any subsequent Contract Period ("Guaranteed Release"), and this Agreement will be considered terminated at the end as of the last day of the applicable Release Deadline.

3. **SERVICES**: Company is hereby engaged to provide various services within the furtherance of Artist's career in the music industry as set forth in this Agreement.

## RECORDING SERVICES

4. **RECORDING REQUIREMENTS:** During the Initial Period and any subsequent Option Periods, Company agrees to pay for the production and release of a long playing album formatted master recording comprised of no less than twelve (12) Masters for a total of twelve (12) recorded songs, embodying Compositions not heretofore recorded by Artist ("Album") and consistent with the style and manner of the masters previously recorded by Artist. In addition to the recording of the required Album during the Initial Term or any Option Period, upon Company's request to do so, Artist agrees to record up to a maximum of ten (10) additional Masters ("Additional Masters"), at various times throughout a Contract Period for release as an Audio Product at various times throughout the Term, including as a single ("Single") or extended play album ("EP"). There is no requirement that the Additional Masters released or included on an LP album format. Company shall pay for the Recording Costs in association with the Additional Masters in accordance with the terms of this Agreement. Artist's Royalty shall be same as for all other Audio Products recorded under the respective Contract Period.

1

## 5. **RECORD PRODUCTION AND EXPENSES:**

a.      Prior to the beginning of any recording session ("Recording Session") Artist and Company shall consult regarding the elements and process necessary to record Masters during a Contract Period. Artist and Company shall consult regarding the Compositions to be recorded, the producers and studio to be used for the Recording Sessions, the amount of money to be spent on recording the Masters ("Recording Budget") and the dates and times to record the Masters ("Pre-Production Process"). Company shall have the right and opportunity to have a representative attend each Recording Session and each Master shall be subject to Company's approval as technically satisfactory for the sale of Audio Products. The time for completion of the Pre-Production Process and Recording Sessions for any Masters recorded hereunder ("Album Recording Process") shall be by mutual agreement. Artist agrees to use their best efforts to complete the Album Recording Process, under this Agreement in a consecutive three (3) month period the beginning of which shall be mutually agreed by the parties and subject to Artist's touring schedule, if any. For purposes of clarification, the Album Recording Process shall consist of the process of recording master quality recordings for mixing, master and release on Audio Products and shall not consist of the process writing compositions or recording demo quality recordings. The decisions regarding all matters under this paragraph 5 shall be by mutual agreement, however in the event of a disagreement, the decision of Company shall control

b.      Company shall have final decision on all money to be spent on all cost incurred for the Recording Sessions ("Recording Costs"). The cost of travel, meals, transportation and lodging for one representative to attend any Recording Session for the Masters recorded hereunder shall be considered a Recording Cost, provided that such costs shall be limited to coach class air fare and at minimum 3 star hotel accommodations. The parties will consult regarding the Recording Costs and will be mutually approved within the Recording Budget. Company shall enter into all agreements with all third parties providing services in furtherance of the production of the Masters and all Recording Costs will be paid by Company directly to such third parties as incurred. The cost of travel and lodging for one representative to attend a Recording Session shall be considered a Recording Cost. Artist shall not incur any Recording Costs without Company's written approval ("Unauthorized Recording Cost"). Artist shall be personally responsible for any Unauthorized Recording Cost to any third party. If Company chooses to pay for such Unauthorized Recording Cost then it shall be treated as a Recording Cost.

c.      Upon Company's request, Artist shall re-record, and Company shall pay for such re-recording of, any Composition recorded hereunder until a recording, which in Company's sole judgment is technically satisfactory for the sale of Audio Products. Should Artist fail to appear at any recording session of which Artist has been given written notice, for any reason, without Artist giving forty-eight (48) hours notice to Company of an inability to appear as scheduled, then Artist shall be personally responsible to repay Company within thirty (30) days of Company's presentation of an invoice for the cost incurred by Company for Artist's failure to appear without providing such notice.

d.      Company shall have the right to negotiate a contract for the services of any person or company providing production services for Artist on the Masters. Specifically, Company may negotiate to pay any producers of master recordings, producers that create musical tracks, musicians or side artists performing on the Masters, a fee and/or royalties from the exploitation

2

of the Masters or the sale of Audio Products. Company shall have the right to negotiate a royalty up to a cumulative amount of all persons performing services for the production of the Masters, not to exceed twenty five percent (25%) of the amount of royalties Artist is paid from Company, without Artist's written consent. Artist understands that any fees paid to Production Personnel is an Expense. All royalty rates in this Agreement are "all-in" rates, which is to say that they include all royalties due to Artist as well as any other artist, producer, engineer, or other third parties of any kind. If Company accepts a letter of direction from Artist regarding the services of any person or company providing production services for Artist on the Masters whereby the person is to receive a royalty, any such payment shall be deducted from Artist's royalty payable hereunder.

6.     **ARTWORK:** Company shall be the owner of the copyright in all artwork created for and incorporated into packaging of Artist's Audio Products ("Artwork") released pursuant to this Agreement. All costs of preparation of such artwork or paid by Company for preparation and rights to Artwork shall be an Expense as set forth in this Agreement. Company agrees to consult with Artist in connection with the preparation of the Artwork. Artist shall approval over the Artwork. However, in the event of a dispute, the decision of Company shall control.

7.     **VIDEO RIGHTS:** During the term hereof, Company shall have the exclusive worldwide right to manufacture and distribute audiovisual programs ("Videos") for commercial and/or promotional purposes including any commercial sale or other exploitation of so-called "long form" Videos or authorize others to do so. All recording and production costs directly or indirectly incurred in connection with the creation of Videos shall be considered Expenses. Artist grants Company a synchronization license for the right to use any Controlled Composition in a Video and waives the right to be paid a separate synchronization fee for the use of the Controlled Composition embodied in a Video or any mechanical license for the distribution and sale of the Video.

8.     **MASTER & VIDEO OWNERSHIP:** All Masters and Videos as described herein, recorded and/or submitted during the Term, together with the performances embodied therein, shall, from the inception of their creation, be entirely the property of Company in perpetuity, throughout the Territory, free of any claim whatsoever by Artist or by any persons deriving any rights or interests from Artist. For the purposes hereof, all such Masters and Videos shall be works made for hire under the United States Copyright Law.  In the event such works are deemed not to be works made for hire, then pursuant to this Agreement Artist hereby transfers Artist's rights to the copyrights in the Masters, Videos and the Previously Recorded Masters to Company. Artist agrees to execute any documents to fulfill the transfer of copyright to the Masters and Videos upon request by Company. Company shall have the right to secure registration of the copyright in and to the Masters and Videos in Company's name as the owner and author thereof and to secure any and all renewals of such copyright. Nevertheless, you shall, upon our request, execute and deliver to us any assignments of copyright (including renewals and extensions thereof) in and to such Masters, and Videos as Company may deem necessary. Company (and its Licensees) shall have the sole and exclusive right to use the Masters and Videos throughout the Territory or any part thereof in any manner it sees fit, including, without limitation, the sole and exclusive right in perpetuity and throughout the Territory:

        a.     To manufacture, advertise, sell, distribute, lease, license, or otherwise use or dispose of the Masters, Videos and Audio Products embodying the songs, in any or all fields of

3

use, including Digital Transmissions, by any method now or hereafter known, upon such terms and conditions as Company may elect or, in its sole discretion, refrain therefrom;

     b.     To release derivatives of any one or more of the Masters on any medium or device now or hereafter known, under any name, trademark or label which Company and its Licensees may from time to time elect.

     c.     Notwithstanding Company's rights set forth in this paragraph, Company agrees that it will not, without Artist's written permission, license any Master recorded and released hereunder in the following exploitations: for synchronization in films with an X rating or greater, synchronization in a scene in any audiovisual production involving nudity, synchronization in any media advertisement containing any political message or sales of products involving personal hygiene or liquor (excluding beer or wine).

## 9.    **DISTRIBUTION:**

     a.     In the event the terms of this Agreement is in conflict with Company's distribution agreement ("Distribution Agreement") with its Distributor of Audio Products, the Distribution Agreement terms shall control only as to those terms inconsistent and in conflict with the terms of this Agreement. However in no event shall the term of the Distribution Agreement affect Artist's Royalty on Audio Products.

     b.     Artist may purchase from Company's physical configurations of Audio Products to sell at its Live Performances at Company's for an amount equal to Company's top line wholesale price paid by retail stores to Company or its distributors. Payment by Artist for physical configurations shall not be considered royalty-bearing units under this Agreement and Artist shall only be entitled to retain the money Artist receives from its direct sales of the units. Such sales to Artist, however, shall be considered part of Gross Receipts for all other purposes under this Agreement. Company shall be responsible for payment of all mechanical royalties and manufacturing costs associated with the physical configuration purchased by Artist. Artist shall be restricted to selling the physical configurations of Audio Products purchased from Company, in a direct person-to-person sale such at Artist's Live Performances or to Artist's friends or family and may not sell them in any other retail manner such as through retail stores, online stores, through Artist's or other websites, etc. Artist may not sell any other configuration of Audio Product from Masters created under this Agreement.

10.    **SIDE ARTIST**: Artist shall not be prohibited from performing as a so-called "featured artist" for third parties. In connection with any such recording for anyone other than Company, the following conditions shall apply:

     a.     Artist's name and likeness shall not appear on the front cover of any such recording;

     b.     Artist's name shall not appear in larger size type than any other side artist on any liner or inserts;

     c.     Artist shall not render a solo performance without the prior consent of Company, and Company shall receive a courtesy credit which states that Artist appears courtesy of

4

Company; and

11.    **MECHANICAL LICENSE**: All musical compositions or material recorded pursuant to this Agreement, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by Artist or any producer of Masters subject thereto (herein "Controlled Compositions") appearing on the Masters and released on Audio Products hereunder, shall be and are hereby perpetually licensed to Company for the Territory for Controlled Compositions appearing on Audio Products released by Company. Company shall be responsible for paying any mechanical royalties owed to third parties for a composition ("Composition"), including co-authors of co-written Controlled Compositions, and such mechanical royalty payment shall be considered an Expense. Artist agrees not to record any Controlled Composition or Composition recorded and delivered to Company hereunder five (5) years from the date of termination of this Agreement.

## PUBLISHING

12.    **GRANT OF PUBLISHING RIGHTS**:

    a.    Subject to those requirements and/or restrictions set forth herein, Artist hereby grants, sells and conveys to Company one hundred percent (100%) share of Artist's copyright interest in all songs written or co-written and recorded by Artist during the Term of this Agreement, (collectively referred to below as "Controlled Compositions") and Company shall have the exclusive rights to administration of artist's interest in the Controlled Compositions for the life of copyright in each instance in the Territory.

    b.    Company and Company's foreign subsidiaries, affiliates and licensees have the fullest possible exclusive rights to administer and exploit the Controlled Compositions, to print, publish, sell, dramatize, use and license any and all uses of the Controlled Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting the Controlled Compositions, including but not limited to licenses for mechanical reproduction, public performance, dramatic uses, synchronization uses and subpublication, and to assign or license such rights to others, to utilize Artist's name and likeness in connection therewith and to execute copyright registration applications (and other routine copyright documents) in Artist's names and on Artist's behalf as attorney-in-fact (which appointment is coupled with an interest and is therefore irrevocable).

    c.    Company's exploitation of the Controlled Compositions shall be restricted in the same manner as its rights to the Masters are restricted under paragraph 8 d. of this Agreement.

13.    **COLLECTION OF PERFORMANCE ROYALTIES:** Small performing rights in the Controlled Compositions, to the extent permitted by law, shall be assigned to and licensed by the performing rights society to which both parties belong. Said society shall be and is hereby authorized to collect and receive all monies earned from the public performance of the Controlled Compositions and shall be and is hereby directed to pay directly to Company one hundred percent (100%) of the publisher's share of public performance fees for the Controlled Compositions for which Artist shall not be entitled to any income therefrom. Artist shall be paid one hundred percent (100%) of the writer's share payable by its affiliated performance rights society and Company shall not be entitled to any income therefrom.

5

14. **LICENSING AND COLLECTION OF MECHANICAL ROYALTIES:** Mechanical royalties for the Controlled Compositions for the United States and Canada may be collected by The Harry Fox Agency, Inc. or any other collection agent which may be designated. If any mechanical licenses are issued directly by Company, it shall do so at the then current statutory rate (with such reduced rates for special types of sales or distribution for which Company customarily grants reduced rates to nonaffiliated record companies).

15. **SUBPUBLISHING AGREEMENTS:** Company may enter into subpublishing or collection agreements with, and license or assign this Agreement and any of its rights hereunder and delegate any of its obligations hereunder to, any persons, firms or corporations in the Territory.

## NAME AND LIKENESS LICENSING

16. **MERCHANDISE RIGHTS AND SERVICES:**

   a.     Artist grants Company, throughout the World, the exclusive right during the Term hereof, to exploit and reproduce and authorize others to exploit and reproduce Artist's Name and Likeness in any manner and in any medium, now known or unknown including, without limitation, in connection with the manufacture, distribution or sale of reproductions of Artist's Name and Likeness on any and all products such as, but not limited to, t-shirts, posters, buttons and pins, etc. ("Merchandise"). Any license or other agreement entered into by Company during the Term hereof for the exploitation of the Merchandise may be effective after the end of the Term hereof but shall be non-exclusive thereafter and only as to the Merchandise created during the Term of this Agreement and shall not restrict Artist's future right to create and market Merchandise after the expiration or termination of this Agreement. Company shall have the right to commercially exploit Merchandise created from any elements incorporated into Album Artwork such as photographs, cover art or other graphic designs created and owned by Company that is incorporated into the Audio Products distributed and sold hereunder or used by Company in marketing or promotion materials previously approved by Artist without any additional approval by Artist. In respect to any Merchandise design created and sold during the Term containing the Artwork, Company shall have the non-exclusive right thereafter to continue to manufacture and sell Merchandise incorporating the Artwork and account to and pay Artist a royalty as set forth in this Agreement.

   b.     Company shall have the exclusive right during the Term of the Agreement and to seek out and make non-exclusive licenses related for the use of Artist's Name and Likeness in all areas other than Merchandise manufactured under this Agreement including but not limited to branding, sponsorships, endorsements, etc ("Specialty License"). No license under this paragraph shall be made without Artist's express written permission. In the event Company is offered any Specialty License opportunity for the use of the Name and Likeness of Artist by a particular person or company and Artist chooses not to accept the opportunity offered, Artist shall not enter into any agreement, written or otherwise, with the person or company offering the proposed Specialty Licensee, or any of its subsidiaries or affiliates for one (1) year after the termination of this Agreement.

6

# LIVE PERFORMANCES

## 17. TOUR EXPENSES:

a.      Company is not obligated, but may from time to time, upon written request of Artist, pay Artist a sum of money to assist in paying for Artist's expenses related to travel, lodging, meals, etc. in relation to a specific live performance or series of performances ("Tour") ("Tour Expense"). In the event Company shall provide a Tour Expense to Artist, Company shall be entitled to the percentage of Net Performance Receipt set forth in paragraph 19. In addition to the Net Performance Receipts to be paid to Company, any Tour Expenses paid to Artist, or on Artist's behalf, shall first be repaid to Company from the Gross Receipts collected from the respective performance or Tour, after which Company shall pay Artist, Artist's share of Net Performance Receipts as set forth in paragraph 19 of this Agreement. In the event the Tour Expenses are not recouped from the Gross Receipts collected by Company or by Artist associated with a specific Live Performance or Tour, Company shall have the right to collect the outstanding Tour Expenses and retain its percentage of Net Performance Receipt from any Gross Receipts derived from subsequent Live Performances or Tours of Artist, until such time as its Tour Expenses are paid back, even if Company does not provide Tour Expenses for the subsequent Live Performances or Tours. Notwithstanding the foregoing, If Company recoups the Tour Expenses expended at any time during any particular Tour for which Company is providing Tour Expenses, Company shall collect Company's share of Net Performance Receipts for the remaining Live Performances associated with the particular Tour.

b.      Artist represents it will cooperate with publicity and promotional efforts of the Company to support sales of Audio Products by appearing or performing from time to time as requested by Company. After the completion of, but prior to the release of any Album under this Agreement, Artist and Company shall consult regarding the support of the release of the Album through Live Performances and appearances by the Artist.  Artist shall cooperate with Company to plan a series of Live Performances and appearances during each Contract Period ("Album Support Period").  Artist shall cooperate and use its best efforts to book, or authorize its booking agent, Artist's manager, to book sufficient Live Performances during the Album Support Period and by agreeing to appear at those Live Performances booked during the Album Support Period. If Artist requests that Company pay Tour Expenses, then prior to the Album Support beginning, Company and Artist shall consult and mutually agree upon an amount to be paid by Company as Tour Expenses during the Album Support Period, if any. If travel is required for a publicity or promotional effort requested by Company to attend, outside of the city of Artist's primary residence for which Artist is not being paid, then Company shall pay for the costs of transportation and lodging, if such be necessary. Company shall pay for such costs in advance of Artist's travel. However if any costs approved by Company in writing are paid by Artist, the Company shall reimburse Artist for such costs related to travel and lodging within fourteen (14) business days following presentment of such fuel and transportation costs. In the event that Artist is required to travel by airplane, for a Company requested publicity or promotion appearance or performance, Company shall prepay such travel and lodging for the entire length of such promotional effort. Tour Expenses for any promotional Live Performance that is requested by Company for Artist to attend is an Expense under this Agreement. All other Tour Expenses not recouped from the Gross Receipts from Artist's Live Performances and Tours are treated as an Advance.

7

## GENERAL PROVISIONS

18. **COLLECTION OF INCOME:** During the Term of this Agreement and in perpetuity thereafter, unless specifically set forth otherwise, Company shall receive and collect :

a. all Gross Receipts derived from advances, royalties or fees or income derived from the sales or licenses of the Masters recorded hereunder including but not limited to sales of Audio Products;

b. except for collection and distribution of the performance royalties as set forth in this Agreement, all Gross Receipts derived from advances, royalties or fees paid to Artist for publishing income derived from the exploitations and licenses of the Controlled Compositions;

c. all Gross Receipts derived from advances, royalties or fees payable for sales of Merchandise derived from the exploitations and licenses of Merchandising Rights or Special Licenses issued by Company;

d. all Gross Receipts derived from advances, royalties or fees paid for the Live Performances by Artist pursuant to the terms and restrictions of paragraph 17.

19. **ROYALTIES:** Company agrees to pay royalties ("Royalties" or "Artist's Royalties") to Artist as follows:

a. Exploitation of Masters and Sales of Audio Products and Videos: Company shall pay to Artist as a royalty, sixty percent (60%) of the Net Recording Receipts calculated by Company, from all sale of Audio Products derived from the Masters or other and exploitations of the Masters, including but not limited to sales of the Masters, sales of Audio Products including Digital Formats, flat fee licenses, etc, and the sale or exploitation of Videos. Recording Costs are considered Advances and shall be recouped only from Artist's Royalties payable under this subparagraph. However, notwithstanding the foregoing, Company shall pay Artist sixty percent (60%) of Net Recording Receipts paid to Company from master use licenses granted to third parties for synchronizing the Masters in film or television programs, including television commercials. For purposes of this paragraph 19, the sale of an LP Album shall mean the sale of (i) an Audio Product manufactured in a physical configuration (e.g. compact disc, digital video disc, vinyl record, etc.), consisting of Masters recorded and released as an LP Album, or; (ii) an Audio Product in a Digital Format consisting of Masters recorded and released as an LP Album, in which the sale is all the Compositions or tracks appearing on the LP Album or in the case of singles, the same number of individual tracks or Compositions appearing on the LP Album for which the individual Composition or track that was sold individually appears. If an Additional Master is recorded, released and sold on Audio Products in a Digital Format but does not appear initially on any Album, such sale of the Audio Product containing the Additional Master shall be counted as a sale for this paragraph as if the Additional Master had appeared originally as part of the immediate preceding Album recorded in the same Contract Period from the first Album sold. Sales are determined by Company or Company's Distributor's normal retail trade channels on its top popular label in the Untied States as determined in accordance with Company's standard accounting procedures and as reflected on statements rendered hereunder,

8

b.      Publishing Income: Except for royalties received by Company's performance rights society for the publisher's share of performance rights as addressed in paragraph 13 of this Agreement, Company shall pay to Artist as songwriter royalties sixty percent (60%) of the Net Publishing Receipts collected by Company for any exploitations or licenses issued by it for the Controlled Compositions, and shall retain the remaining amount for Company's own account.

c.      Merchandise and Specialty Rights Exploitation: Company shall pay Artist sixty percent (60%) of the calculated Net Merchandise Receipts received by Company as a result of the exploitations and licenses issued by Company for the Merchandising Rights or a Specialty License.

d.      Live Performance: For those Live Performances that Company books any of Artist's Tour Expenses, Company shall pay Artist sixty percent (60%) of the Net Performance Receipts earned from an individual Live Performance, or from all the Live Performances that are part of a Tour.

e.      Mechanical Royalty:

i.      All Controlled Compositions appearing on the Masters and released on Audio Products in a Digital Format for Digital Transmissions shall be and are hereby perpetually licensed to Company for the United States and Canada at a Mechanical Royalty per selection equal to one hundred (100%) percent of the mechanical statutory per selection rate (with regard to playing time. Effective on the date of initial U.S. commercial release of the Masters concerned hereinafter sometimes to be referred to as the "Per Selection Rate".

ii.     All Controlled Compositions appearing on the Masters and released on physical configurations of Audio Products (i.e. CDs, vinyl records, etc.) or Audiovisual Products hereunder, shall be and are hereby perpetually licensed to Company for the United States and Canada at a Mechanical Royalty per selection equal to Seventy-five (75%) percent of the mechanical statutory per selection rate (with regard to playing time. effective on the date of initial U.S. commercial release of the Masters concerned hereinafter sometimes to be referred to as the "Per Selection Rate".

iii.    Notwithstanding the foregoing, the maximum aggregate Mechanical Royalty which Company will be required to pay in respect of any single, E.P. or L.P., in any physical formatted Audio Product regardless of the total number of Compositions contained on the, shall not exceed Two (2) times, five (5) times, and Ten (10) times the "Per Selection Rate" respectively. For avoidance of doubt this restriction shall not apply to Audio Products sold in a Digital Format through a Digital Transmission.

iv.     All Mechanical Royalties payable hereunder shall be paid on the basis of net Audio Products sold hereunder for which royalties are payable to Artist pursuant to this Agreement.

v.      Artist agrees not to record any Controlled Composition or other song recorded pursuant to this Agreement without Company's written consent, for the later of i) one (1) years subsequent to the date of release by Company of any Controlled Composition or song recorded hereunder.

9

vi.     Payments made for Mechanical Royalties under this Agreement are considered an Expense.

## 20.   ROYALTY ACCOUNTING:

a.     Statements as to royalties, Artist's Royalties or Mechanical Royalties (collectively referred to as "Royalties" for this paragraph), payable hereunder shall be sent by Company to Artist on or before the thirtieth day of September of the semi-annual period ending the preceding June 30, and on or before the 31st day of March for the semi-annual period ending the preceding December 31st, together with payment of accrued Royalties, if any, earned by Artist hereunder during such semi-annual period, less all Expenses under this Agreement.

b.     No royalties shall be payable to Artist in respect of sales of Audio Products by any of Company's distributors or licensees until payment has been received by Company or credited to Company. Sales by any such licensees shall be deemed to have occurred in the semi-annual accounting period during which such licensees shall have rendered to Company accounting statements for such sales.

c.     Royalties in respect of the sale of Audio Products outside of the United States shall be computed in the national currency in which Company is paid by Company's licensees, shall be credited to Artist's royalty account hereunder at the same rate of exchange as Company is paid, and shall be proportionately subject to any transfer or comparable taxes which may be imposed upon Company's receipts.

d.     Artist shall be deemed to have consented to all Royalty statements and all other accountings rendered by Company hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account state, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by Artist to Company within one (1) year after the date rendered.

e.     Company shall maintain books of account concerning the sale of Audio Products hereunder. Artist, or a certified public accountant, in Artist's behalf, may, at Artist's sole expense, examine Company's books relating to the sale of Audio Products hereunder solely for the purpose of verifying the accuracy thereof, only during Company's normal business hours and upon reasonable written notice. Company's books relating to any particular royalty statement may be examined as aforesaid only within one (1) year after the date rendered and Company shall have no obligation to permit Artist to so examine Company's such books relating to any particular royalty statement more than once.

## 21.   NAME & LIKENESS, TRADEMARKS AND WEBSITES:

a.     During the Term of this Agreement and for as long as Company shall be entitled to the rights granted to it under this Agreement, including the sale of Audio Products or to sell or distribute Merchandise or exploit Artist's Controlled Compositions, Artist hereby licenses to Company the exclusive right, and to license others the non-exclusive right, to use Artist's name, approved likeness, voice, approved biographical material or other identification for use in association with any promotion, marketing or advertising, in any medium now known and

10

existing or that is created in the future. However, during the Term of this Agreement, Artist will not license or consent to the use of Artist's Name and Likeness for or in connection with the recording or exploitation of Audio Products under this Agreement by or for anyone other than Company. This paragraph shall not limit Company's rights it has been granted in this Agreement regarding Merchandising Rights or Specialty License set forth in this Agreement.

b. Artist shall apply for and obtain in Artist's name, and at Artist's expense, federal registration of a trademark and/or service mark for Artist's professional name and /or logo in connection with the use thereof in all areas of the entertainment industry, including, without limitation, in connection with the recording and sale of phonograph records, the establishment of fan clubs, the rendition of concerts and live performances, and the sale of clothing and other merchandise. If Artist fails to apply for and obtain federal registration of any such trademark or service mark, Company shall thereafter have the right to apply for and obtain federal registration of any such trademark or service mark, in Artist's name, for which costs shall be considered an Advance and Artist hereby appoints Company as its attorney-in-fact, coupled for the purpose of applying for and obtaining such registration. Such authority is coupled with an interest and is therefore irrevocable.

c. Company or its designees shall have the perpetual and exclusive right to create and maintain a web site ("Web Site") for purposes of promoting Artist and the sale of Artist's Audio Products. Company shall have the right to Artist's Name and Likeness in the Web Site. Company shall be the owner of all materials containing Artist's Name and Likeness created and incorporated into Artist's Web Site subject to the approval of Artist as set forth in this Agreement. Company shall have the right to register as its own, any domain name that incorporates or uses Artist's name or any variation of Artist's name. Company shall have the right to designate any Artist's Web Site as the "official" web site. Notwithstanding, Artist shall have the right to create one (1) Web Site in connection with Artist's services as a recording and performing artist. However, Artist shall not be restricted from creating any number of social networking sites (i.e. Twitter, Facebook, etc.).

22. **DEFINITIONS:** For the purpose of this Agreement, the following terms shall have the following meaning:

**"Audio Products"**, shall mean all forms of sound reproductions whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, embodying sound, including, without limitation, discs of any speed or size, vinyl, compact disc, reel-to-reel tapes, cartridges, cassettes, audiovisual recordings, Digital Formats, Digital Transmissions, etc.

**"Audio Visual Recordings"** (**"Videos"**) shall mean devices reproducing audio performances or recording artists together with a visual image for home use or otherwise, embodying Artist's performances.

**"Compositions"** shall mean any single musical composition, irrespective of length, including all spoken words and bridging passages and a medley.

**"Contract Period"** shall mean any period of the Agreement wherein a term or obligation may be applicable either in the Initial Period or any subsequent Option Periods.

11

"**Controlled Compositions**" shall mean all musical Compositions or material recorded pursuant to this Agreement, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by Artist or any producer of Masters subject thereto.

"**Delivery**" shall mean Company's receipt of newly-recorded technically satisfactory Masters to constitute the Record required to be given to Company as per this Agreement (mixed and mastered), together with all necessary licenses, approval, consents and permissions and all Artwork to be used in connection with the production and distribution of Audio Products derived from the Masters recorded hereunder.

"**Digital Format**" shall mean a digital configuration of a Master Recording used in the furtherance of delivering the Master Recording through a Digital Transmission including but not limited to digital files such as MP3, MPEG, WAV, RAM, etc. or any other digital file now known or created in the future.

"**Digital Transmissions**" shall mean the transmission and distribution to the consumer of Digital Formats or other configurations other than physical Audio Products, whether of sound alone, sound coupled with an image or sound coupled with data, in any form including but not limited to the downloading or other conveyance of Artist's performance on Masters or Audiovisual Recordings recorded hereunder by telephone, satellite, cable, direct transmission over wire or through the air, and on-line computers whether a direct or indirect charge is made to receive the transmission.

"**Entertainment Services**" shall mean the exclusive services of Artist performed in the music industry now existing or hereafter developed including but not limited to the areas of Recording, Publishing, Merchandise Rights and Live Performance as set forth in this Agreement.

"**Expenses**" shall mean all expenses incurred under this Agreement, except for Recording Costs, as that term is defined herein, distribution fees, licensing fees, and other payments to third parties on Artist's behalf, outstanding Tour Expenses not repaid from Gross Receipts collected by Company attributed to Live Performances, outstanding Expenses related to the creation, production or manufacture of Merchandise not repaid from Gross Receipts attributed to Merchandising Rights, legal or accounting fees payable to Artist's own legal counsel or accountant (if any such payments are actually made by Company), customary artwork, taxes, mechanical royalties payable to third parties or payable to Artist hereunder, manufacturing, packaging charges, payable on Artist's behalf, or fees associated with filing copyright fees; attorney's or accounting fees or other administrative expenses paid for the creation, enforcement, licensing or exploitation of Artist and Artist's rights granted to Company herein, and; any other costs, fees, or expenses directly related to the representation or exploitation of Artist consistent with the terms of this Agreement; royalties paid by Company to Artist for a writer's share of publishing royalties; administrative and exploitation expenses of Company with respect to the Controlled Compositions including, without limitation, copyright registration fees, advertising and promotion expenses directly related to the Controlled Compositions, the costs of transcribing for lead sheets, and the costs of producing demonstration records, and; any other costs, fees, or expenses directly related to the representation or exploitation of Artist's rights granted to Company in this Agreement including those expenses paid to Artist or on Artist's behalf by Company prior to the effective date of this Agreement. .

12

"**Gross Receipts**" shall mean any and all revenue, income and sums derived and actually received by Company for the exploitation of Artist's Entertainment Services and rights granted to Company by Artist under this Agreement.

"**Long-Playing**" ("**LP**") shall mean a Record that has no less than ten (10) Compositions and being no less than forty (40) minutes in duration.

"**Master Recording**" ("**Master**" or "**Masters**") shall mean any master recording, recorded under this Agreement together with any derivatives thereof. Any reference to Master, Masters or Master Recording shall include the Previously Recorded Masters.

"**Name and Likeness**" shall mean Artist's individual names (both professional and legal and whether presently or hereafter used by you) image, likeness, logos and other identification and biographical material concerning Artist and any trade name, trademark or service mark used by the individual members of Artist (collectively, "Name and Likeness")

"**Net Merchandise Receipts**" shall mean Gross Receipts received by Company under the terms of this Agreement for Merchandising Rights or Special Licenses after deducting any and all Expenses attributed to the licensing thereof or for the cost of creating, producing or manufacturing or distributing Artist's Merchandise. In the event Expenses attributed to Merchandise Rights or Special Licenses are not fully recouped from the Net Merchandise Receipts, Company may treat such unrecouped amount as an Expense hereunder recoupable from Gross Receipts.

"**Net Performance Receipts**" shall mean Gross Receipts received by Artist or Company on Artist's behalf for Artist's Live Performances less Tour Expenses and any fees deducted by Artist's booking agent.

"**Net Publishing Receipts**" shall mean Gross Receipts received by Company under the terms of this Agreement attributed to the publishing exploitation of Artist's songs recorded hereunder after deducting any and all Expenses.

"**Net Recording Receipts**" shall mean Gross Receipts received by Company under the terms of this Agreement attributed to the exploitation of Artist's Master Recordings recorded or licensed hereunder and from sale of Audio Products derived from Artist's Master Recordings, after deducting any and all Expenses

"**Recording Costs**" shall be considered Advances under this Agreement and shall mean all costs incurred with respect to the production of Masters embodying the Artist's performances, including audio visual recordings, and which are customarily recognized as Recording Costs in the phonograph record industry including but not limited to all expenses incurred in connection with the production, mixing and mastering of audio and/or visual masters and all payments and/or advances to Artist hereunder, as well as payments to all of the musicians (including without limitation, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors) vocalists and producers, if any, rendering services in connection with any recordings hereunder, payments to union pension and welfare funds, costs of cartage and instruments hire, studio or hall rentals, editing costs, payroll taxes and other payments to third parties on Artist's behalf related to recording costs, fees to third party producers or side artists, fees for replay or a

13

sampling license, and other reasonable expenses incurred by Company for the purpose of production of the Masters; costs, taxes and/or third party payments in connection with the production of the Masters produced under this Agreement.

"**Term**" shall mean the duration of the Agreement including the Initial Period and subsequent Option Periods and any extensions or modifications extending the duration of the Agreement.

"**Tour Expense**" shall mean the payment of all Company approved expenses to attend or produce a Live Performance including but not limited to costs for production, promotion or talent expenses associated with the performance, travel, lodging and per diem expenses to be incurred by Artist in connection with the Live Performance. Any costs associated for compensation, travel, lodging or per diem paid by Company for an employee or representative of Company assisting with the touring or producing of Live Performance of Artist, provided such costs shall be limited to those in like kind expended by Artist for the same or similar expense.

"**Territory**" shall mean the World.

23.    **WARRANTIES AND REPRESENTATIONS:** Artist warrants and represents the following:

a.    Artist is not now and during the Term shall not be a party to or bound by any contract or agreement that will interfere in any manner with the manufacture and marketing and sale of the Recording by Company. Artist is under no disability, restriction or prohibition with respect to Artist's right to sign and perform under this Agreement.

b.    The songs and performances embodied in the Recordings, and any use thereof by Company or its grantees, licensees, or assigns, will not violate or infringe upon the rights of any third party. Artist has secured all proper licenses for the right to perform and record all or any part of the performances or recording embodied on Artist's Master including for the use of any third party's recording or composition for use in what is commonly known as "sampling", "replay", or "interpolation".

c.    Artist expressly acknowledges that Artist's services hereunder are of a special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by Artist of any term, condition, or covenant hereof, Company will be caused irreparable injury. Artist expressly agrees that in the event Artist shall breach any provisions of this Agreement, Company shall be entitled to seek injunctive relief and/or damages, as Company may deem appropriate, in addition to any other rights or remedies available to Company, and Company shall have the right to recoup any such damages resulting from any such breach, which shall be reduced to a final, adverse judgment, from any monies which may be payable to Artist hereunder or under any other agreement between Artist and Company. During the term of this Agreement, the minimum compensation shall be set forth as per California Civil Code Section 3423 (the "Code") per fiscal year required under the law (the "Minimum Compensation"). If any applicable law is hereafter changed to provide for a different minimum compensation requirement as a requisite for injunctive relief, then the Minimum Compensation shall be automatically amended to such new figure as of the effective date of such change with respect to such member(s) of Artist as Company shall designate. Failure of Company to fail to pay Artist

14

the minimum amounts guaranteed under the Code, shall not be considered a breach of contract and Artist's only remedy is that Company is precluded from filing an injunction against Artist to enforce Company's rights under this Agreement unless Company pays the necessary amount required by the Code to file the injunction, to Artist that Company wishes to enforce the terms of this Agreement against.

     d.     During the Term of this Agreement, if required by law or any other agreement that Company may become a party to, Artist shall become and remain a member in good standing of any appropriate labor union or unions. If Company becomes a party to any such union agreement, Company shall give Artist written notice of such action.

     e.     Artist warrants that it is the sole owner of its professional name and that Artist has the sole and exclusive right to use and to allow others to use the Artist's professional name in connection with Artist's Entertainment Services.

     f.     Artist understands that the record industry and sales of records is speculative and that Company makes no warranty or representations as to the success of the sales of Artist's Audio Products distributed and sold hereunder.

     g.     Artist hereby warrants and represents that it has the right to enter into this Agreement and to grant to Company any rights granted herein, and that the exercise by Company of any and all rights with respect to the Controlled Compositions will not violate or infringe upon any common law or statutory rights of any person, firm or corporation, including without limitation, contractual rights, copyrights and rights of privacy. The rights granted herein are free and clear of any claims, demands, liens or encumbrances.

     h.     The parties hereto shall execute any further documents including without limitation, assignments of copyrights, and do all acts necessary to fully effectuate the terms and provisions of this Agreement.

24.    **INDEMNIFICATION:** Both Company and Artist agree to and do hereby indemnify, save and hold each other harmless of and from any and all loss and damage (including reasonable attorney's fees) arising out of or connected with any claim by any one or more third parties or any act by each other which is inconsistent with any of the warranties, representations, and/or agreements made by each party herein, and agrees to reimburse each other on written demand for any reasonable payment made by either party at any time with respect to any liability or claim to which the foregoing indemnity applies. Pending the determination of any claim involving such alleged breach or failure, Company may withhold sums due to Artist hereunder in an amount consistent with such claim. Any judgments against Company and any settlements by Company of claims against Artist together with costs and expenses, including attorney's fees shall be paid to Company promptly upon demand and may also be recouped by Company from any Royalties payable to Artist hereunder.

25.    **CURE OF BREACH:** Neither party will be deemed in breach unless the other party gives notice and the notified party fails to cure within thirty (30) days after receiving notice (fifteen (15) days, in the case of a payment of money); provided, that if the alleged breach does not involve a payment of money and is of such a nature that it cannot be completely cured within thirty (30) days, the notified party will not be deemed to be in breach if the notified party

15

commences the curing of the alleged breach within such thirty-day period and proceeds to complete the curing thereof with due diligence within a reasonable time thereafter.

## 26. SUSPENSIONS AND DEFAULT:

a. Company reserves the right by written notice to Artist to suspend its obligation hereunder and/or to extend the expiration date of the then-current Contract Period for the duration of the following contingencies if by reason of such contingencies it is materially hampered in the recording, manufacture, distribution or sale of Audio Products, or its normal business operations become commercially impractical: labor disagreements, fire, catastrophe, shortage of materials or any cause beyond Company's control.

b. In the event of any default or breach by Artist in the performance of any of Artist's obligation or warranties hereunder, Company, by written notice to Artist, in addition to any other rights or remedies which it may have at law or otherwise, at its election, may terminate the Term or may suspend its obligations hereunder for the duration of such default or breach and/or may extend the expiration date of the then-current Contract Period for a period equal to all or any part of the period of such default or breach.

c. In the event of any default or breach by Company in the performance of any of its obligations or warranties hereunder, Artist shall give Company written notice of such default. Company shall then have sixty (60) days to cure such breach before being declared by Artist to be in breach or default of this Agreement.

27. **APPROVAL:** Unless otherwise stated in this Agreement, wherever in this Agreement Artist's approval or consent is required, Artist's approval shall not be withheld unreasonably and failure to give such approval or disapproval within seven (7) days of notice by Company shall be deemed an approval by Artist. When such approval is to be mutual, in the event of a dispute Company's decision shall control.

28. **ASSIGNMENT:** Company shall have the right to assign this Agreement or any of Company's rights hereunder or to delegate our obligations hereunder or any part thereof to any third party. Specifically, but not limiting the generality of the foregoing, Company shall have the right to enter into a long term recording, production or distribution agreement, on terms no less favorable than those contained herein, for the provision of Artist's services as exclusive recording artists or assigning any of our rights hereunder with any "Major" record company or nationally distributed independent label, (as those terms are understood in the recording industry). Artist's rights and obligations hereunder are personal and non-delegable.

29. **SUCCESSOR IN INTEREST:** This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successor, permitted assigns, and representatives. Company may, at its election, assign this Agreement or any of its rights hereunder.

30. **INVALIDITY OF TERMS:** If any clause, sentence, paragraph or part of this Agreement, or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgment shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in

which such judgment shall have been rendered and to the person involved.

31.    **NOTICES:** All notices hereunder required to be given to Company shall be sent to Company at its address first mentioned herein and all royalty statements (and payments) and all notices to Artist shall be sent to Artist as Artist's address first mentioned herein, or such other address as each party respectively may hereafter designate by notice in writing to each other. All notices shall be in writing and shall be sent by registered mail or certified mail, return receipt requested. The day of mailing of any such notice shall be deemed the date of the giving thereof. Royalty statements (and payments) may be sent by regular mail. All notices shall be served upon Company to the attention of the Manager.

32.    **APPLICABLE LAW:** This Agreement has been entered into in the State of California and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of California applicable to contracts entered into and performed entirely within the State of California, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement. Any dispute claim, mediation or lawsuit arising out of this Agreement shall be filed in Los Angeles County, California.

33.    **AMENDMENT:** This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver termination or discharge of this Agreement shall be binding upon the Company unless confirmed by a written instrument signed by an authorized officer of the Company. No waiver of any provision or any default under this Agreement shall constitute a waiver by Company of compliance thereafter with the same or any other provision or its right to enforce the same or any other provision thereafter.

34.    **MEDIATION:** Any claim or dispute arising out of or relating to this Agreement or the breach thereof shall first attempt to be settled by mediation in the jurisdiction set forth in this Agreement in accordance with the rules and regulations of the American Arbitration Association governing single member panels or any other mediation procedure agreed to by the parties. In the event mediation of the parties hereto is not successful then each party hereto shall have the right to pursue any claim arising out of the dispute by any other legal means available to them within the competent jurisdiction.

35.    **INDEPENDENT CONTRACTOR:** Nothing contained herein shall constitute a partnership between or a joint venture by Company and Artist. It is specifically understood that Artist is acting hereunder as an independent contractor.

36.    **RIGHT TO LEGAL REPRESENTATION: Artist represents and warrants that Artist has read this Agreement and Artist understand that this is an important legal document. Artist hereby represents and warrants that Artist has been advised of its right to seek independent legal counsel in connection with the negotiation and execution of this Agreement and that Artist has either retained and has been represented by such legal counsel or has knowingly and voluntarily waived its right to such legal counsel and desires to enter into this Agreement with the benefit of independent legal representation.**

17

This Agreement is effective the first date of the Agreement written above.

**COMPANY:**

MIH ENTERTAINMENT, LLC, a
California limited liability company

By: _____
Michael Conner, Senior VP of A&R

**ARTIST:**

_____
Alex Gonzalez Velazquez, an individual

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am over the age of 18 and not a party to the within action; I am employed by SINGH, SINGH & TRAUBEN, LLP in the County of Los Angeles at 400 S. Beverly Drive, Suite 240, Beverly Hills, CA 90212.

On September 7, 2017, I served the foregoing document described as:

**FIRST AMENDED COMPLAINT FOR:**

**1. DECLARATORY RELIEF; 2. DECLARATORY RELIEF; 3. BREACH OF MANAGEMENT AGREEMENT; 4. BREACH OF FIDUCIARY DUTY; 5. CONVERSION; 6. FRAUD; and for an 7. ACCOUNTING**

☑ **(BY MAIL)** enclosed in sealed envelope(s): I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ **(BY E-MAIL OR ELECTRONIC TRANSMISSION)** I caused the document(s) to be sent from e-mail address yiakovleva@singhtraubenlaw.com to the persons at the e-mail addresses listed in the Service List.

☐ **(BY FEDERAL EXPRESS DELIVERY)** I served the foregoing document by FedEx, an express service carrier as follows: I placed true copies of the foregoing document in sealed envelopes or packages designated by the express service carrier, addressed to each interested party as set forth above, with fees for delivery paid or provided for.

☐ **(BY PERSONAL SERVICE)** I caused such envelope(s) to be hand delivered to the offices of the addressee(s).

☑ (State) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☐ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on September 7, 2017 at Beverly Hills, California

Yulia Iakovleva

SINGH,
SINGH &
TRAUBEN,
LLP

1  **ALEX GONZALEZ VELAZQUEZ p/k/a KING LIL G v. MICHAEL W. CONNER, JR. *et al.***

2
   **ASSIGNED TO:**
3  **ASSIGNED TO HON. DALILA CORRAL LYONS, DEPARTMENT 20**

4  **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
   **COUNTY OF LOS ANGELES - CENTRAL DISTRICT**
5

6  **CASE NO: BC6653688**

7  **SERVICE LIST**

8

9  **LAW OFFICE OF DANI OLIVA**        *Attorney for Defendants*
   **DANIEL OLIVA, ESQ.**              MICHAEL W. CONNER JR. *and*
10 300 Long Beach Blvd.                MIH ENTERTAINMENT, LLC
   P.O. Box 215
11 Long Beach, CA 90801-0215
   Tel:    213.537.8357
12 Fax.:   310.564.5906
   dani@olivaesq.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SINGH,
SINGH &
TRAUBEN,
LLP

2
**PROOF OF SERVICE**